**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SOFIE KARASEK; NICOLETTA COMMINS; ARYLE BUTLER, *Plaintiffs-Appellants*, <br><br> v. <br><br> REGENTS OF THE UNIVERSITY OF CALIFORNIA, *Defendant-Appellee.* | No. 18-15841 <br><br> D.C. No. 3:15-cv-03717-WHO <br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted October 21, 2019
San Francisco, California

Filed January 30, 2020
Amended April 20, 2020

Before: Jay S. Bybee and N. Randy Smith, Circuit Judges,
and Salvador Mendoza, Jr.,[*] District Judge.

---

[*] The Honorable Salvador Mendoza, Jr., United States District Judge for the Eastern District of Washington, sitting by designation.

Order;
Opinion by Judge Bybee

## SUMMARY[**]

### Title IX

The panel filed (1) an order amending its opinion, denying a petition for panel rehearing, and denying on behalf of the court a petition for rehearing en banc; and (2) an amended opinion affirming in part and vacating in part the district court's judgment in favor of defendant Regents of the University of California on claims brought under Title IX of the Education Amendments of 1972 by three plaintiffs who were sexually assaulted while undergraduates at the University of California, Berkeley.

Plaintiffs alleged that UC violated Title IX by failing to adequately respond to their individual assaults and by maintaining a general policy of deliberate indifference to reports of sexual misconduct.

The panel affirmed the district court's dismissal of two plaintiffs' individual claims and grant of summary judgment on a third plaintiff's individual claim. To state a Title IX claim arising from student-on-student or faculty-on-student sexual harassment or assault, a plaintiff suing a school must allege that (1) the school exercised substantial control over the harasser and the context in which the harassment

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

occurred; (2) the harassment was so severe that it deprived the plaintiff of educational opportunities; (3) a school official with authority to address the alleged discrimination had actual knowledge of it; (4) the school acted with deliberate indifference to the harassment, such that the school's response was clearly unreasonable in light of the known circumstances; and (5) the school's deliberate indifference subjected the student to harassment. The panel affirmed the district court's holding that two plaintiffs failed adequately to allege deliberate indifference in UC's investigation delays, policy violations, failure to take steps to prevent continued harassment, inequitable response, or failure to permit a plaintiff to participate in an investigation. The panel affirmed the district court's holding that the third plaintiff failed to establish a triable issue as to whether UC acted with deliberate indifference by failing to investigate her complaint, failing to take steps to prevent the harasser from harassing her again, or committing policy violations.

The panel vacated the district court's dismissal of the pre-assault claim regarding an alleged policy of deliberate indifference to reports of sexual misconduct that created a sexually hostile environment for plaintiffs and heightened the risk that they would be sexually assaulted. The panel held that such a claim is a cognizable theory of Title IX liability. Finding persuasive a decision of the Tenth Circuit, the panel held that a pre-assault claim survives a motion to dismiss if the plaintiff plausibly alleges that (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the

plaintiff of access to the educational opportunities or benefits provided by the school. The panel remanded the case for further proceedings.

## COUNSEL

Alexander S. Zalkin (argued), The Zalkin Law Firm P.C., San Diego, California, for Plaintiffs-Appellants.

Hailyn J. Chen (argued) and Bradley S. Phillips, Munger Tolles & Olson LLP, Los Angeles, California; Susan M. Pelletier, Munger Tolles & Olson LLP, Washington, D.C.; for Defendant-Appellee.

## ORDER

The court's opinion filed January 30, 2020, and appearing at 948 F.3d 1150 (9th Cir. 2020), is hereby amended in the following ways:

1. At slip. op. 32–33; 948 F.3d at 1169, change <(2) which created a heightened risk of sexual harassment> to <(2) which created a heightened risk of sexual harassment that was known or obvious>

2. At slip op. 33, 948 F.3d at 1169, change <(4) the plaintiff was harassed as a result> to <(4) as a result, the plaintiff suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.>

An amended opinion is filed herewith.

With this amended opinion, the panel has voted to deny the petition for panel rehearing.  Judge Bybee, Judge N.R. Smith, and Judge Mendoza recommended denying the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc.  Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc, filed March 13, 2020, are **DENIED**.  No subsequent petitions for rehearing or rehearing en banc may be filed.

**OPINION**

BYBEE, Circuit Judge:

Appellants Sofie Karasek, Nicoletta Commins, and Aryle Butler were sexually assaulted while undergraduates at the University of California, Berkeley (UC).  They sued UC under Title IX of the Education Amendments of 1972 (Title IX), asserting two theories of liability.  First, Appellants allege that UC violated Title IX by failing to adequately respond to their individual assaults.  Second, Appellants allege that UC violated Title IX by maintaining a general policy of deliberate indifference to reports of sexual misconduct, which heightened the risk that Appellants would be assaulted.  This latter theory is known as the "pre-assault claim" because it relies on events that occurred before Appellants' assaults.  The district court dismissed Karasek's

individual claim, Commins's individual claim, and the pre-assault claim, and it granted summary judgment to UC on Butler's individual claim.   We affirm the dismissal of Karasek's and Commins's individual claims and the grant of summary judgment on Butler's individual claim.   However, we vacate the dismissal of the pre-assault claim and remand for further proceedings.

## I.  BACKGROUND

For purposes of this appeal, we must accept as true the factual allegations in Appellants' Fourth Amended Complaint (FAC) and in documents of which the district court took judicial notice.  *See United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011).  We remind the parties and other interested persons that the facts have not been established.  *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 907 (9th Cir. 2012) (en banc).

## A.  *Karasek's Individual Claim*

In February 2012, Karasek attended an overnight trip with the Cal Berkeley Democrats Club (Club).  While sleeping in a bed with three other students, Karasek awoke because TH, one of the other students in the bed, was "massaging her legs, back and buttocks."   This continued for thirty minutes. Karasek reported the assault to the Club president.

On February 14, 2012, the Club president informed a UC official that TH had assaulted three Club members:  Karasek and two other women who had reported being assaulted to the Club president.   The UC official "discouraged" the Club president from removing TH from the Club, instead suggesting she "use more informal, transformative justice

models to deal with TH." After TH admitted to the Club president that he had assaulted Karasek, she asked TH to resign from his board position, but allowed him to continue attending Club events. Several months later, TH assaulted another Club member. The Club president notified UC that more women had reported that TH sexually assaulted them. The president then removed TH from the Club altogether.

On April 20, 2012, Karasek and three other women met with Denise Oldham, UC's Title IX Officer, and Hallie Hunt, the Director of the Center for Student Conduct (CSC), to formally report their assaults. Contrary to UC's Sexual Harassment Policy, Karasek was not told of the options for resolving her claim, the range of possible outcomes, the availability of interim protective measures, or that UC would not actually investigate unless Karasek submitted a written statement. One month later, Karasek learned that one of TH's other victims had submitted a written statement. She "thought it was a good idea," so she also submitted a written report to Hunt on May 15, 2012.

On May 14, 2012, Glenn DeGuzman, the Assistant Director of CSC, met with TH. TH admitted that he had "acted foolishly." No formal consequences resulted from that meeting. Instead, DeGuzman merely emailed TH the next day, asking him to "please stay away from alcohol" and cautioning:

> If you do drink, do so responsibly. Make the decision now to not put yourself in situations to be alone with other women specifically if you are drinking. Until you can better understand what you are experiencing, it is in

> your best interest to not put yourself in that
> situation.

TH was then allowed to participate in UC's "Cal in the Capitol" program during the summer of 2012 with no restrictions.

Oldham met with TH for the first time on September 17, 2012. Several weeks later, Oldham emailed CSC, stating that she "determined that this situation could be resolved without a formal investigation by [the Title IX] office," and that "from her perspective, she considered the sexual harassment issue with TH to be resolved."

CSC then began an informal process with TH. On October 10, 2012, DeGuzman sent TH an Administrative Disposition Letter stating that TH had violated UC's Student Code of Conduct. TH could choose either to discuss this finding with DeGuzman further or to accept responsibility and submit to a number of sanctions. TH chose the former option and met with DeGuzman. Following this meeting, DeGuzman sent a second Administrative Disposition Letter. This letter, however, omitted one of the sanctions that had been included in the first letter—namely, that TH meet with a UC Health Educator to discuss "gender issues and sexual misconduct." TH accepted responsibility on October 26, 2012. As a result, the following sanctions applied: (1) disciplinary probation until TH graduated, (2) one consultation with a mental health practitioner of TH's choice, and (3) one meeting with an Alcohol and Other Drugs Counselor in UC's Social Services department.

Meanwhile, Karasek had received no communications from UC since filing her written statement in May 2012. She

was not informed that Oldham opted not to formally investigate. Nor was Karasek told that her complaint against TH had been resolved informally or that TH was sanctioned. Karasek alleges that UC's failure to apprise her of the investigation or allow her to participate violated UC's Sexual Misconduct Policy and a 2011 Dear Colleague Letter issued by the Department of Education (DOE). *See* Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011) [hereinafter 2011 Dear Colleague Letter or DCL].

Eventually, Karasek learned that TH would graduate from UC in December 2012. Frustrated that UC was not timely handling her complaint, Karasek met with Christine Ambrosio, the Director of Women's Resources at UC's Gender Equity Resource Center, on November 2, 2012, to voice her concerns. A couple of days later, Ambrosio emailed Karasek, saying that she had contacted CSC and was waiting for an update on the TH investigation. After Karasek sent several more emails, someone in UC's Title IX office finally responded on December 12, 2012. That email simply said that "this matter had been explored and resolved using an early resolution process outlined in our campus procedures for responding to sexual harassment complaints," and that the Title IX officer had "communicated the outcome of the resolution process to the Center for Student Conduct." The email did not describe the investigation's outcome. TH then graduated from UC. A few days later, an individual in CSC emailed Karasek, saying that TH had violated the Code of Student Conduct. Again, this email did not inform Karasek of any of the sanctions imposed. Karasek did not learn the nature of the sanctions until September 20, 2013.

B.  *Commins's Individual Claim*

In January 2012, Commins invited an acquaintance from the Tae Kwan Doe team, John Doe 2 (Doe 2), to her apartment.  While there and without Commins's consent, Doe 2 performed oral sex on Commins, digitally penetrated her, rubbed his genitals on her face, and attempted to physically coerce her to perform oral sex on him.  Commins reported the assault to UC's Tang Student Health Center the next day and to UC's Police Department on January 20, 2012.  The Alameda District Attorney's Office charged Doe 2 with felony sexual assault.

On January 31, 2012, UC placed Doe 2 on interim suspension, prohibiting him from entering campus.  After a hearing, UC modified the interim suspension to allow Doe 2 on campus solely to attend his classes.  UC did not inform Commins of the suspension or the hearing.

Commins submitted an Incident Report Form to CSC on February 22, 2012.  Several weeks later, Julio Oyola, a CSC representative, met with Commins to discuss her allegations. At this meeting, Oyola intimated that UC would not investigate until after the Berkeley Police Department finished its criminal investigation.  Commins told Oyola that she was not comfortable with a delay, to no avail.  UC's Dean of Students sent a letter to Doe 2 on May 11, 2012, informing him that he was again placed on interim suspension to "accommodate [his] request to postpone [UC's] hearing upon [his] charges until such time as criminal charges pending against [him] have been resolved."

Doe 2 was convicted of felony assault on October 5, 2012.  UC's officials then began communicating with Doe 2

and his attorney about UC's investigation. At some point during these exchanges, a UC official told Commins that a formal hearing would be held where Commins could present evidence. No hearing was ever held. Instead, on January 21, 2013, Oldham told Commins that she had completed her investigation of Doe 2, found that he had violated UC's Policy on Sexual Harassment, and forwarded that finding to CSC.

CSC then began an informal investigation. Hunt met with Doe 2 and his attorney on February 4, 2013. Following that meeting, Hunt asked Commins if she would be comfortable with Doe 2 being suspended until she graduated. Commins said that she preferred that Doe 2 be permanently expelled, but Hunt responded that this was not possible. Commins reluctantly agreed that a suspension of her assailant was the best available option.

As a result, CSC sent Doe 2 an Administrative Disposition Letter, informing him that he had violated the Code of Student Conduct. The letter imposed the following sanctions: (1) suspension until August 31, 2015; (2) exclusion from campus and UC activities until that same date; (3) permanent disciplinary probation; (4) prohibition on contacting Commins; and (5) a reflective writing assignment. Doe 2 accepted these sanctions on March 5, 2013.

In March, Hunt emailed Commins to inform her of the outcome of CSC's investigation. This email was sent to an address that Commins had never used to communicate with UC, so Commins did not see the email. Four months later, Commins emailed Hunt, seeking an update on the investigation. Hunt promptly responded and described Doe

2's sanctions.  Commins was not given an opportunity to appeal or contest these sanctions.

Nearly one year later, Commins informed Hunt that she had been accepted to UC's graduate School of Public Health and expressed concern that Doe 2 would return to campus while Commins pursued her graduate studies.  Hunt confirmed that Doe 2 planned to return to UC once his suspension ended.  Commins asked UC to preclude Doe 2 from returning to campus until she graduated. UC denied that request.  Doe 2 recommenced his education in August 2015.  While he attended UC, he remained subject to UC's no-contact order.  Commins does not allege that she saw Doe 2 again.

## C.  *Butler's Individual Claim*

During the summer of 2012, Butler worked as a research assistant to Margot Higgins, a graduate student.  Higgins paid Butler directly, and Butler did not receive academic credit for her work.  The research occurred in Alaska.  While in Alaska, Butler lived at the Wrangell Mountains Center (WMC), a nonprofit entity unaffiliated with UC.  WMC also hosted programming for the Alaska Wildlands Studies Program, where Butler's assailant, John Doe (Doe), was a part-time instructor.

Doe had a reputation for giving hugs, some of which were "longer than what felt comfortable."  According to Butler, one night, while Butler was alone in WMC's common area, Doe came up behind her, trapped her against a table, put his hands down her pants, touched her inappropriately, and then left.  Shortly after this incident, Butler told Higgins that "someone had done something inappropriate, had touched her

inappropriately, but that she handled it."  Higgins asked if it was Doe, and Butler confirmed that it was.  Higgins said that she would not do anything if Butler felt like she had dealt with the situation.

Several days later, Doe approached Butler from behind, ran his fingers through her hair, and rubbed her shoulders. Doe said, "It's so nice to have such a beautiful woman around," and then left.  Butler again called Higgins, told her what Doe did, and informed Higgins that the encounter made her "uncomfortable" and that she "didn't like it."  Higgins told Butler that she would do whatever Butler wanted. Apparently, nothing came of this call.

A few days after that, Butler was singing while preparing dinner in WMC's kitchen.  Doe came up behind her, put his hands under her shirt, and touched her breasts.  As he left, Doe said, "You have such a beautiful voice."  Immediately after that incident, Butler called Higgins and told her what happened.  Higgins allowed Butler to stay in Higgins's cabin, which was outside of WMC's property, until Doe left.  Butler did not interact with Doe again.

Butler first reported her assaults to UC on November 20, 2012, in a meeting with Ambrosio.  Butler cannot recall what details they discussed, but she does know that she did not identify Doe as her assailant at that meeting.  On February 28, 2013, Butler met with Oldham and Ambrosio.   Butler expressed her desire to remain anonymous, fearing retaliation if she reported the assault.  Ultimately, Butler told Oldham where the assaults had occurred, but did not disclose Doe's identity.

Several months later, Butler emailed Ambrosio and explained that Butler believed UC was violating federal law, state law, and UC's policies in the manner in which it was handling Butler's report. Butler and one of her friends met with Ambrosio and Oldham on April 26, 2013. At this meeting, Oldham noted that UC's policies would not apply unless Butler's assailant was UC's employee. Butler then revealed the names of the Alaska Wildlands Studies Program, WMC, Higgins, and Lynn Huntsinger, who was Higgins's faculty advisor. According to Oldham's notes, Butler asked Oldham to research the program to determine whether UC's policies would apply.

Oldham emailed Huntsinger on May 21, 2013, asking about the Wildlands Studies Program. Huntsinger said she was not aware of that program, but after searching on the internet, she discovered that it was a California State University, Monterey Bay program. The next day, Oldham emailed Butler to ask for more details about her participation in the Wildlands Studies Program and for a copy of the contract she signed with Higgins. Before Butler responded, Oldham received an email from Leslie Arutunian, an employee with the Wildlands Studies Program. Arutunian told Oldham that the program had no connection to UC.

On May 30, 2013, Oldham emailed Butler again, notifying her that Oldham had received new information. Because of various scheduling conflicts, Butler did not meet with Oldham until August 7, 2013. Butler contends that at this meeting she identified Doe as her assailant and told Oldham that Doe was a guest lecturer at UC. Oldham showed Butler the documents Arutunian had sent and said that Arutunian was willing to speak with Butler about her assaults. Butler preferred that Oldham follow up with

Arutunian instead.  This was the last time Butler met with Oldham, and Oldham did not take any further steps to investigate Butler's claims.

At his deposition, Doe confirmed that he visits UC's campus "once or twice a year," and that he sporadically serves as a guest speaker.  Doe estimated that he gives a guest lecture once "every year or two," and that he had been on UC's campus five or six times since the summer of 2012.

D.  *Pre-Assault Claim*

To support Appellants' pre-assault claim, the FAC includes allegations relating to UC's history of responding to reports of sexual misconduct.  The FAC describes a 2014 report prepared by the California State Auditor detailing several deficiencies in UC's handling of sexual-harassment cases between 2009 and 2013.  The FAC also highlights an administrative Title IX claim filed in 2014 by thirty-one women, alleging that UC has not adequately responded to complaints of sexual assault since 1979.  Appellants allege that UC resolved a majority of sexual-assault complaints with informal processes, even though Oldham publicly stated that only formal processes should be used in cases of sexual assault.  And finally, the FAC alleges that UC "consciously and intentionally" chose to resolve sexual-assault reports informally to avoid its statutory duty to report cases of sexual violence to DOE.  Based on these allegations, the FAC concludes that UC maintained "a policy of deliberate indifference to sexual misconduct against female students" that created a "sexually hostile environment" and heightened the risk that Appellants would be assaulted.

E.  *Proceedings Below*

After multiple rounds of motions to dismiss, the district court dismissed all but Butler's Title IX claim.  Following discovery on Butler's claim, the district court granted summary judgment to UC.  The court then entered judgment in favor of UC on all claims.

Appellants timely appealed from that judgment, challenging the district court's summary-judgment order and its orders granting UC's motions to dismiss.  On appeal, Appellants argue that Karasek and Commins adequately pleaded a Title IX violation based on UC's response to their reports of sexual assault, Butler established a genuine issue of material fact as to whether UC violated Title IX in its response to her report, and Appellants adequately alleged that UC's policy of indifference to sexual misconduct violated Title IX.

## II.  JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 28 U.S.C. § 1331.  We have jurisdiction under 28 U.S.C. § 1291.

We review de novo the grant of a motion to dismiss under Rule 12(b)(6) and may affirm on any ground supported by the record.  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).  This "[r]eview is limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice."  *Id*.  When considering a motion to dismiss, we accept "as true all well-pleaded allegations of fact in the complaint" and construe them in the light most favorable to the non-moving party.  *Corinthian Colls.*,

655 F.3d at 991.  A complaint will not survive a motion to dismiss unless it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

We also review a grant of summary judgment de novo.  *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019).  A party is entitled to summary judgment "only if, taking the evidence and all reasonable inferences in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law."  *Id.* (citing Fed. R. Civ. P. 56(a)).  "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party."  *Id.* (internal quotation marks omitted).  Factual determinations underlying a grant of summary judgment will not be reversed unless they are clearly erroneous.  *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014).

## III.  DISCUSSION

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Victims of sex discrimination have a private right of action against recipients of federal education funding for alleged Title IX violations, *see Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979), and may seek damages for those violations, *see Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 75–76 (1992).  Damages are available if the "official policy" of the funding

recipient discriminates on the basis of sex. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). In the absence of an official policy, damages are not recoverable unless "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* In other words, there must be "an official decision by the recipient not to remedy the violation." *Id.*

As already noted, Appellants assert two types of claims—individual claims and a pre-assault claim. We address the individual claims first.

A. *Individual Claims*

To ensure that a funding recipient is liable "only for its own misconduct," *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999), a plaintiff alleging a Title IX claim against a school that arises from student-on-student or faculty-on-student sexual harassment or assault must establish five elements.[1] First, the school must have "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]." *Id.* at 645. Second, the plaintiff must have suffered harassment "that is so severe, pervasive, and objectively offensive that it

---

[1] These five elements are in addition to the threshold requirements that the defendant be a recipient of "[f]ederal financial assistance" and that the plaintiff experienced sex discrimination. *See* 20 U.S.C. § 1681(a). Here, there is no dispute that UC receives federal funding and that Appellants' sexual assaults constituted sex discrimination. *See Davis*, 526 U.S. at 649–50 ("[S]exual harassment is a form of discrimination for Title IX purposes . . . .").

can be said to deprive the [plaintiff] of access to the educational opportunities or benefits provided by the school." *Id.* at 650. Third, a school official with "authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf" must have had "actual knowledge" of the harassment. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000); *see Davis*, 526 U.S. at 650. Fourth, the school must have acted with "deliberate indifference" to the harassment, such that the school's "response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. This is a fairly high standard—a "negligent, lazy, or careless" response will not suffice. *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). Instead, the plaintiff must demonstrate that the school's actions amounted to "'an official decision . . . not to remedy'" the discrimination. *Id.* (quoting *Gebser*, 524 U.S. at 290) (alteration in original). And fifth, the school's deliberate indifference must have "subject[ed the plaintiff] to harassment." *Davis*, 526 U.S. at 644. Put differently, the school must have "cause[d the plaintiff] to undergo harassment or ma[d]e [the plaintiff] liable or vulnerable to it." *Id.* at 645 (internal quotation marks omitted).

The Supreme Court has emphasized that Title IX "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* at 648. Rather, "the recipient must merely respond . . . in a manner that is not clearly unreasonable." *Id.* at 649. Absent an unreasonable response, we cannot "second-guess[] the disciplinary decisions made by school administrators." *Id.* at 648. And the reasonableness of the response depends on the educational setting involved—what would be

unreasonable in the context of an elementary school might not be unreasonable in the context of a university. *Id.* at 649.

The district court dismissed Karasek's and Commins's claims for failing to adequately allege the fourth element—deliberate indifference.  On Butler's claim, the district court found that she failed to demonstrate the first, fourth, and fifth elements—that UC controlled Butler's assailant, acted with deliberate indifference, and caused Butler to undergo harassment.  We affirm the district court's orders with respect to each of the individual claims.[2]

### 1.  Karasek's individual claim

Karasek argues that the FAC adequately alleges that UC was deliberately indifferent in four respects:  (a) UC unjustifiably delayed its investigation, (b) UC violated its own policies and the DCL when responding to Karasek's report, (c) UC took no steps to prevent TH from continuing to harass Karasek, and (d) the substance of UC's response was inequitable.

### a.  UC's alleged delay

A school's delayed response constitutes deliberate indifference if it prejudices the plaintiff or if the delay was a "deliberate attempt to sabotage [the p]laintiff's complaint or its orderly resolution."  *Oden*, 440 F.3d at 1089.  In *Oden*, the plaintiff argued that a nine-month delay between the

---

[2] Because we address only the fourth element, we express no opinion on the circuit split regarding the fifth element.  *Compare Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613 (6th Cir. 2019), *with Farmer v. Kan. State Univ.*, 918 F.3d 1094 (10th Cir. 2019).

plaintiff's report of sexual assault and a formal hearing held by her college established deliberate indifference. *Id*. We rejected that argument. We noted that the college acted shortly after the plaintiff's report by providing counseling, helping her file a formal complaint, and ordering her assailant not to contact her. *See id.* Although the nine-month delay was "negligent, lazy, or careless," it did not amount to deliberate indifference, given the school's actions in the meantime. *Id*.

Here, eight and one-half months elapsed between the date when UC had actual notice of Karasek's assault and when TH accepted the sanctions UC proposed. But like the college in *Oden*, UC was not idle during those months. When the Club president told UC that TH sexually assaulted a student, UC communicated with the president to determine the best course of action. Less than one month after Karasek reported her assault to CSC, DeGuzman met with TH to discuss the charges. Oldham met with him again at the beginning of the ensuing fall semester, eventually leading to the issuance of several Administrative Disposition Letters. To be sure, the actions UC took after learning of Karasek's assault may have been less helpful than the college's actions in *Oden*. Nevertheless, UC's actions and attendant delay did not constitute a "deliberate attempt to sabotage [Karasek's] complaint or its orderly resolution." *Id.*

Karasek relies on *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007). But that case involved a level of indifference far more extreme than anything present here. In *Williams*, the University of Georgia did not hold a disciplinary hearing until eleven months after the plaintiff informed the university that she had been gang-raped by members of the basketball team.

*Id.* at 1296–97. The university's police department had performed a "thorough investigation" and produced a comprehensive report within a few months of the assault that largely corroborated the plaintiff's account, but the university still took no action. *Id.* at 1296–97. By the time the disciplinary hearing was held, several of the plaintiff's assailants no longer attended the university. *Id.* at 1296. The Eleventh Circuit concluded that, in those circumstances, the university's delay was deliberately indifferent. *Id.*

Unlike the university in *Williams*, UC met with and ultimately sanctioned Karasek's assailant while he still attended school. Any delay did not prejudice Karasek. Even though UC could have acted more quickly, UC's delay did not constitute deliberate indifference.

### b.   UC's alleged policy violations

Ordinarily, a school's "failure to comply with [DOE] regulations . . . does not establish . . . deliberate indifference." *Gebser*, 524 U.S. at 291–92. The same is true of a school's violations of its own policies. *See Oden*, 440 F.3d at 1089 (finding no deliberate indifference even though the school's nine-month delay "contravene[d] College policy"); *see also Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169–70 (5th Cir. 2011) ("[J]ust because [the school official] allegedly failed to follow district policy does not mean that her actions were clearly unreasonable.").

UC's alleged conduct was inconsistent with both the DCL and its own policies. The DCL advises a school to "take immediate steps to protect" the complainant, afford the parties "an equal opportunity to present relevant witnesses and other evidence," give "periodic status updates" to both

parties, and promptly notify the parties "in writing[] about the outcome of both the complaint and any appeal." 2011 Dear Colleague Letter, at 10–13.**3**  Many of these provisions are reflected in UC's own policies.  Further, both the DCL and UC's policies provide that a sexual-assault complaint should be resolved within sixty days.  *Id.* at 12.  Finally, UC's Interim Sexual Misconduct Policy requires CSC to "consult with the Complainant" before resolving a sexual-assault complaint informally via an Administrative Disposition Letter.  UC followed none of these provisions.

Yet, this does not constitute deliberate indifference per se. The DCL itself states that it is applying a standard that is less exacting than the deliberate-indifference test used in "private lawsuits for monetary damages."  *Id.* at 4 n.12.  In other words, in DOE's view, a school could fail to abide by the DCL's provisions and yet not violate the deliberate-indifference standard.   We cannot say that UC was

---

**3**  The DCL is a "good practices" or "significant guidance document," as defined by the Office of Management and Budget (OMB).  *See id.* at 1 n.1.  According to OMB, guidance documents may set forth an agency's "policy on . . . or interpretation of a statutory or regulatory issue," but they may not "impose a legally binding requirement" that adds to existing law. Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432, 3434 (Jan. 25, 2007).  DOE acknowledges that the DCL informs DOE's judgment of whether a school is "complying with [its] legal obligations," but cautions that the DCL applies the "standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief," and not the deliberate-indifference standard. 2011 Dear Colleague Letter, at 1 n.1, 4 n.12.

Further, we note that DOE has rescinded the DCL, albeit long after the events alleged in the FAC transpired.  *See* Dear Colleague Letter, Candice Jackson, Office for Civil Rights, U.S. Dep't of Educ., at 1 (Sept. 22, 2017).

deliberately indifferent solely by disregarding the DCL and its own policies.

To avoid this conclusion, Karasek, citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986), argues that the DCL is DOE's interpretation of Title IX, so we must defer to that interpretation.   But *Meritor* involved a question of statutory interpretation:   whether the phrase "discriminate against any individual . . . because of such individual's . . . sex" in Title VII encompassed a sexually hostile work environment. *See id.* at 63–67 (quoting 42 U.S.C. § 2000e-2(a)(1)).   We do not face a statutory interpretation issue.   A damages remedy for Title IX violations is judicially implied, not statutorily created.   The Supreme Court has crafted "a sensible remedial scheme" with "a measure of latitude . . . that best comports with the statute." *Gebser*, 524 U.S. at 284. Because the DCL does not address that remedial scheme, the DCL is merely advisory and not an interpretation of Title IX that need be afforded deference in this context under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).   The Supreme Court in *Davis*, not Congress, articulated the deliberate-indifference standard. All we must decide is whether UC's conduct qualifies as deliberate indifference under that standard.   *Meritor* is inapposite, and the DCL does not control our inquiry here. *See Gebser*, 524 U.S. at 291–92.

That is not to say that the DCL is entirely irrelevant to the deliberate-indifference inquiry.   Although we are aware of no federal court of appeals that has addressed the impact of DOE guidance documents when analyzing deliberate indifference, many district courts have concluded that those documents may guide the analysis. *See, e.g.*, *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 659 (W.D. Tex. 2017) ("While the

Court agrees that a school's failure to comply with certain DOE guidelines generally cannot, alone, demonstrate a school's deliberate indifference, . . . it also agrees with numerous courts that DOE regulations may still be consulted when assessing the appropriateness of a school's response to reports of sexual assault."); *Butters v. James Madison Univ.*, 208 F. Supp. 3d 745, 757–58 (W.D. Va. 2016) (noting that "a school's compliance or non-compliance with the DCL can be a factor that the court considers," but a violation of the DCL "would not be dispositive on the issue of deliberate indifference"); *Doe v. Forest Hills Sch. Dist.*, No. 1:13-cv-428, 2015 WL 9906260, at \*10 (W.D. Mich. Mar. 31, 2015) ("Although failure to comply with Title IX guidance does not, on its own, constitute deliberate indifference, it is one consideration." (emphasis omitted)).

We agree that the DCL is useful as a persuasive document that sets forth DOE's considered views. Yet, given DOE's decision to rescind the DCL in 2017, *see supra* note 3, the DCL's persuasive force is somewhat limited. Regardless, a school's failure to follow the DCL's provisions, standing alone, will not constitute deliberate indifference. But that failing may be relevant, particularly when it reflects "an official decision . . . not to remedy the [Title IX] violation." *Gebser*, 524 U.S. at 290.

Ultimately, we conclude that UC's noncompliance with the DCL and its own policies was, at most, "negligent, lazy, [and] careless." *Oden*, 440 F.3d at 1089. Nevertheless, because UC investigated Karasek's complaint, met with her assailant shortly after she submitted her written report, and eventually imposed appropriate sanctions, UC's noncompliance did not constitute deliberate indifference to Karasek's complaint.

c.  UC's alleged failure to preclude further harassment

Karasek argues that UC was deliberately indifferent by failing to preclude the possibility that TH could harass Karasek again after she reported the assault.  UC could have immediately imposed interim sanctions on TH, such as barring him from campus during UC's investigation or issuing a no-contact order, particularly given that UC was aware that multiple women reported being sexually assaulted by him.  Indeed, in hindsight, UC's decision to initially discourage the Club president from expelling TH from the Club is troubling.  UC instead attempted to resolve the complaints against TH informally through "an early resolution process."  We might have handled the situation differently, but the Supreme Court has instructed us to "refrain from second guessing the disciplinary decisions made by school administrators" unless those decisions were "clearly unreasonable."  *Davis*, 526 U.S. at 648.

UC's decisions were not clearly unreasonable.  Karasek never interacted with TH again after the assault, aside from seeing him from afar on one occasion.  And there is no indication that Karasek told Oldham and Hunt that she regularly saw TH when meeting with them on April 20, 2012.  As a result, UC had no reason to know that preventative measures were necessary to protect Karasek from future harassment, especially in light of the context and nature of her assault (though, as we note below, UC's lack of communication with Karasek likely prevented UC from fully understanding what preventative steps may have been necessary).  UC's failure to implement protective measures did not exhibit deliberate indifference.

   d.   The substance of UC's response

   Karasek argues that "UC's response was wholly inequitable" because UC allowed TH to participate in the "Cal in the Capitol" event and communicated with TH while ignoring Karasek.  Choosing not to prohibit TH from attending "Cal in the Capitol" does not establish deliberate indifference, for "[a]n aggrieved party is not entitled to the precise remedy that he or she would prefer." *Oden*, 440 F.3d at 1089.  Indeed, Karasek does not allege that she would have attended "Cal in the Capitol" but for TH's presence, so it is unclear that UC's decision not to forbid TH from attending while UC's investigation continued was clearly unreasonable. As for UC's lack of communication, this is an inexcusable omission by UC's officials.  Keeping a victim of sexual assault largely in the dark about the investigation of her assailant and the ultimate sanctions imposed is not only inappropriate, but also deprives the school of information that might be crucial to its investigation.  Nevertheless, despite its lack of communication, UC acted on Karasek's complaint and imposed arguably appropriate sanctions on TH.  Thus, UC was not deliberately indifferent to Karasek's assault.

   Because the allegations in the FAC fail to show that UC made "an official decision . . . not to remedy the [Title IX] violation," *Gebser*, 524 U.S. at 290, we affirm the district court's dismissal of Karasek's individual Title IX claim.

   2.   Commins's individual claim

   Like Karasek, Commins argues that the FAC adequately alleges deliberate indifference for several reasons:  (a) UC unjustifiably delayed its investigation, (b) UC violated the DCL and its own policies, (c) UC failed to take steps to

prevent Doe 2 from further harassing Commins, and (d) UC unreasonably failed to permit Commins to participate in the investigation of Doe 2.

### a.   UC's alleged delay

Commins argues that UC unjustifiably delayed its resolution of Commins's complaint.  Thirteen months elapsed after Commins reported her assault before UC imposed final sanctions on Doe 2.  This delay was partially engendered by UC's decision to stay its investigation until Doe 2's criminal charges were resolved.  But UC did not sit on its hands during those months.   To the contrary, within two weeks of Commins's report, UC placed Doe 2 on interim suspension, barring him from campus.   Doe 2 remained on that suspension, with a slight modification allowing him to attend classes, throughout the investigation.   This is unlike the University of Georgia in *Williams*, which failed to act against the assailants for eleven months.  Commins's allegations thus fail to show that the thirteen-month delay prejudiced her or was a "deliberate attempt to sabotage [her] complaint." *Oden*, 440 F.3d at 1089.   UC's actions were not clearly unreasonable.

### b.   UC's alleged policy violations

Like Karasek, Commins argues that UC's investigation ran afoul of the DCL and UC's policies.  While investigating Commins's complaint, UC acted inconsistently with all the provisions of the DCL and its own policies that we have already identified.   Indeed, given the violent nature of Commins's assault, Commins likely should have been afforded the opportunity to present testimony and other evidence at a formal hearing, as the DCL recommends and

UC's policies require.  UC also violated its Interim Sexual Misconduct Policy's prohibition on suspending an investigation merely because of pending criminal charges against the assailant, which the DCL advises against as well. *See* 2011 Dear Colleague Letter, at 10.  But for the reasons expressed above, this does not establish deliberate indifference, particularly in light of the interim suspension immediately placed on Doe 2 to protect Commins while UC's investigation was stayed.

### c.  UC's alleged failure to prevent further harassment

Commins asserts that UC was deliberately indifferent because "Doe 2 was not placed on interim suspension until three months" after Commins's report, and because UC "never issued a no-contact order."  Both assertions are incorrect.  As demonstrated by the FAC's allegations, UC placed Doe 2 on interim suspension within two weeks of Commins's report, not three months.  And UC did issue a no-contact order to Doe 2 as part of the final sanctions imposed. Commins does not allege that these protective measures were ineffective. Indeed, Commins identifies no instance when she ever saw Doe 2 again after reporting her sexual assault. Thus, Commins's argument here fails to demonstrate UC's deliberate indifference.

### d.  UC's alleged failure to allow Commins to participate in the investigation

Finally, Commins argues that UC responded inequitably by constantly communicating with Doe 2 while failing to update Commins or provide her with an opportunity to participate in the investigation.  Although UC contacted Commins several times during the investigation and

discussed potential sanctions with her, we agree that UC's general lack of communication was likely a significant failing.   And as noted above, the decision to resolve Commins's complaint informally without allowing Commins to testify or present evidence is troubling, given the context and nature of her assault.   If she had been given that opportunity, perhaps UC would have dealt even harsher sanctions.   The wisdom of UC's decision not to expel a convicted felon, or at least extend his suspension while Commins pursued graduate studies at UC, can be questioned. Despite these shortcomings, however, UC's response did not exhibit deliberate indifference.  After Commins reported her assault, UC moved quickly to suspend her assailant, and UC imposed fairly stringent sanctions upon resolution of Commins's complaint.  We may disagree with UC's handling of Commins's complaint, but that does not suffice for Title IX liability.  *See Oden*, 440 F.3d at 1089.   We affirm the district court's dismissal of Commins's individual claim.

### 3.   Butler's individual claim

In granting summary judgment to UC, the district court held that Butler's Title IX claim failed because UC's response was not deliberately indifferent.[4]  On appeal, Butler argues that UC was deliberately indifferent in three respects: (a) UC failed to investigate her complaint at all, (b) UC failed to take steps to prevent Doe from harassing Butler again, and (c) UC violated the DCL and its own policies.

---

[4]   The district court rejected Butler's claim for two additional, independent reasons:  UC lacked control over Butler's assailant and UC did not cause Butler to experience severe and pervasive harassment. Because we affirm the district court's finding that UC was not deliberately indifferent, we do not address the district court's additional findings.

### a.  UC's investigation

Butler's argument that UC failed to investigate her complaint is demonstrably false.  Indeed, the district court found that this argument "misrepresents the record."  After Butler reported her assault and asked Oldham to investigate, Oldham discussed the nature of the Wildlands Studies Program with a UC faculty member to determine if UC's policies would apply.  That conversation led Oldham to discover that the program was affiliated with California State University, Monterey Bay, and not with UC.  Oldham also emailed Leslie Arutunian, an employee with the Wildlands Studies Program, who confirmed that the program had no connection to UC.  At that point, Oldham concluded that UC's policies did not apply to Butler's assault and stopped investigating.  Thus, UC did in fact investigate Butler's complaint, and the extent of its investigation was not "clearly unreasonable."  *See Davis*, 526 U.S. at 648.

### b.  UC's alleged failure to prevent further harassment

Butler argues that UC was deliberately indifferent by failing to preclude the possibility that Doe could harass Butler again.  But it is unclear what interim protective measures UC should have imposed.  As the district court found, Doe "was an independent third-party with no official relationship to UC."  Accordingly, UC could not directly sanction Doe, as it could if Butler's assailant had been a UC student or faculty member.  And Butler never told Oldham that she feared meeting Doe on campus or that she wanted UC to issue a no-contact order.  Indeed, when Butler asked for help obtaining academic accommodations, UC did so, demonstrating UC's sensitivity to Butler's requests.  Finally, Butler never claims to have seen Doe again after her assault.  Given the

information UC knew at the time, UC's failure to immediately implement protective measures does not constitute deliberate indifference.

### c.   UC's alleged policy violations

Butler contends that UC violated the DCL and UC's own policies by failing to (1) "respond to Butler's complaint," (2) "act when [Butler] wanted to remain anonymous," or (3) "implement any interim measures to remediate her hostile environment on campus."  We have already concluded that UC did respond to Butler's complaint and that the lack of protective measures was not clearly unreasonable. Regardless, as we explained above, UC's failure to follow the DCL's guidance or abide by the school's own policies does not establish deliberate indifference.  *See supra* Section III.A.1.b.   Accordingly, we affirm the grant of summary judgment to UC on Butler's individual claim.

## B.  *Appellants' Pre-Assault Claim*

In addition to their individual Title IX claims, Appellants allege that UC maintained a "policy of deliberate indifference to sexual misconduct" that "created a sexually hostile environment for [Appellants]" and heightened the risk that Appellants would be sexually assaulted.  UC argues that this pre-assault theory of Title IX liability "fails as a matter of law" because it is "contrary to . . . Supreme Court precedent." The district court dismissed this claim because it found Appellants' argument that UC's "level of awareness or deficiency of response with respect to the general problem of sexual violence is enough to establish either actual knowledge or deliberate indifference for the purposes of a Title IX claim" without sufficient basis in our case law.   To the

district court's credit, we have never directly addressed pre-assault Title IX claims. We hold that such a claim is a cognizable theory of Title IX liability. Because we clarify the standard applicable to such claims, we vacate the district court's dismissal of Appellants' pre-assault claim and remand for further proceedings.

As explained above, a plaintiff asserting a Title IX claim based on sexual harassment committed by a faculty member or peer must demonstrate that the school had "actual knowledge" of the harassment and responded with "deliberate indifference." *See Davis*, 526 U.S. at 650. This ensures that a school is "liable in damages under Title IX only for its own misconduct," and not that of third parties. *Id.* at 640.

But the calculus shifts when a plaintiff alleges that a school's "official policy" violates Title IX. *See Gebser*, 524 U.S. at 290. In that context, the school has "intentionally violate[d] the statute." *Davis*, 526 U.S. at 642. A school need not have had actual knowledge of a specific instance of sexual misconduct or responded with deliberate indifference to that misconduct before damages liability may attach. *See Gebser*, 524 U.S. at 290; *see also Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 967 (9th Cir. 2010) ("[W]here the official policy is one of deliberate indifference to a known overall risk of sexual harassment, notice of a particular harassment situation and an opportunity to cure it are not predicates for liability."). Thus, a pre-assault claim should survive a motion to dismiss if the plaintiff plausibly alleges that (1) a school maintained a policy of deliberate

indifference to reports of sexual misconduct,[5] (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.

We find persuasive the Tenth Circuit's decision in *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007). There, the University of Colorado hosted talented high school football players on campus each fall. The recruits were to be shown "a good time" and "were paired with female 'Ambassadors.'" *Id.* at 1173. Some recruits were "promised an opportunity to have sex," and there was evidence that the coaching staff not only knew of this conduct, but encouraged it. *Id.* at 1173–74. The university was aware of prior complaints of sexual misconduct by recruits and had been warned by the district attorney that the university needed to supervise the recruits and implement sexual assault prevention training. *Id.* at 1173–74, 1179–84. The plaintiffs were two women who were sexually assaulted by football recruits. Asserting a pre-assault claim, the plaintiffs argued that the university had a history of responding with deliberate indifference to reports of sexual assaults occurring in its football recruiting program.

---

[5] We do not hold that deliberate indifference to reports of past sexual misconduct is the only form of pre-assault conduct that could result in an institution's Title IX liability. Rather, we focus on the sufficiency of such allegations because they are what the FAC articulates. We do not have occasion to consider whether other forms of pre-assault conduct could amount to an official policy of deliberate indifference that is actionable under Title IX.

*Id.* at 1174–75, 1177.  The district court granted summary judgment to the university, finding that the plaintiffs failed to establish "actual notice" and "deliberate[] indifferen[ce]." *Id.* at 1174.  The Tenth Circuit reversed.  It held that "when [a Title IX] violation is caused by [an] official policy," the "notice standards established . . . in *Gebser* and *Davis*" do not apply because, in that case, "the institution itself, rather than its employees (or students), [is] the wrongdoer."  *Id.* at 1177–78.  Because the "risk of . . . [sexual] assault" in the football recruiting program was "obvious," the failure to remedy that risk constituted an official policy of deliberate indifference that violated Title IX.  *Id.* at 1178, 1180.

UC reads *Simpson* to require that the risk of sexual harassment be a "specific problem in a specific program." Based on that understanding, UC argues that Appellants' allegations of a heightened risk of sexual harassment throughout UC's programs cannot survive.

We disagree.  To be sure, *Simpson* involved a particular program.  But *Simpson*'s reasoning, and the reasoning of *Gebser* and *Davis*, supports imposing Title IX liability when a school's official policy is one of deliberate indifference to sexual harassment in any context subject to the school's control.  Of course, it may be easier to establish a causal link between a school's policy of deliberate indifference and the plaintiff's harassment when the heightened risk of harassment exists in a specific program.  But we will not foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus.

Applying the framework we have set forth, we vacate the district court's dismissal of the pre-assault claim.  Allegations

that UC had actual knowledge or acted with deliberate indifference to a particular incident of harassment are unnecessary to sustain this theory of liability. Instead, all Appellants need allege are facts demonstrating the four elements we have articulated above.

What the FAC does allege is troubling. The FAC describes a report issued in 2014 by the California State Auditor that details deficiencies in UC's approach to sexual-misconduct complaints. *See* CALIFORNIA STATE AUDITOR, REP. NO. 2013-124, SEXUAL HARASSMENT AND SEXUAL VIOLENCE (2014). The Auditor found that, over a five-year period, UC "resolved 76 percent of Title IX complaints from students using the early resolution process" in a generally inadequate manner. *Id.* at 53. For example, UC could not "demonstrate that [it] consistently informed students of what to expect as the university investigated their complaints." *Id.* at 55. UC also failed to "provide regular updates on the status of [its] investigations to students." *Id.* at 57. It did not "consistently complete investigations in a timely manner." *Id.* at 61. And it "did not notify all student complainants of the outcome of an investigation and the subsequent disciplinary action against the accused." *Id.* at 59. Further, the Auditor found that UC did not sufficiently educate its employees and students about preventing sexual harassment, which led to the "mishandl[ing]" of sexual-misconduct complaints and "put[] the safety of [its] students at risk." *Id.* at 15, 30.

The FAC also highlights an incongruity between UC's public statements and its handling of sexual-misconduct complaints. In February 2014, Denise Oldham—UC's Title IX Officer—stated in an interview with the *Los Angeles Times* that she "could not imagine a situation where" using an

early resolution process for cases involving sexual assault "would be appropriate." If Oldham's premise is correct—that early resolution is not an appropriate mechanism for resolving sexual-assault claims—UC's conduct during the period in question appears inexplicable. According to the FAC, of the five hundred cases of sexual misconduct reported to UC's Office for the Prevention of Harassment and Discrimination in 2012, only two were resolved through a "formal process." Similarly, of the fourteen sexual-misconduct complaints reported to UC's Center for Student Conduct in 2013, all "were resolved through the . . . informal resolution process."

Finally, the FAC alleges that UC had a powerful incentive to resolve cases through an informal process. The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act requires UC to annually publish the number of "criminal . . . sex offenses, forcible or nonforcible," that were "reported to campus security authorities or local police agencies" and that occurred on or around campus during the prior two years. 20 U.S.C. § 1092(f)(1)(F)(i). According to the FAC, UC "takes the position" that "it is not required to report the offense" pursuant to the Clery Act "if the matter is resolved informally." Assuming that is true (as we must, at this stage), it is plausible that choosing to resolve sexual-misconduct complaints through an early resolution process enables UC to escape these statutory disclosure requirements.

UC argues that Appellants' allegations are less probative of an official policy than the evidence mustered by the plaintiffs in *Simpson*. We agree that the allegations here are much broader than the specific problem of sexual assault in the University of Colorado's football recruiting program. But

UC's argument misses the mark.  We are here on a motion to dismiss.  *Simpson* involved a motion for summary judgment, after the parties had conducted discovery.  Thus, the question is not whether Appellants' allegations are comparable to the evidence produced in *Simpson*.  Rather, the question is whether Appellants plausibly allege that UC had a policy of deliberate indifference that heightened the risk of sexual harassment on campus, resulting in the assaults Appellants experienced.

Ultimately, we leave to the district court to decide, in the first instance, whether Appellants' allegations are sufficient to survive a motion to dismiss under the principles we have set forth.  We reiterate that Title IX does not require UC to purge its campus of sexual misconduct to avoid liability.  *See Davis*, 526 U.S. at 648.  A university is not responsible for guaranteeing the good behavior of its students.  The element of causation ensures that Title IX liability remains within proper bounds.  To that end, adequately alleging a causal link between a plaintiff's harassment and a school's deliberate indifference to sexual misconduct across campus is difficult.  Whether the FAC plausibly alleges such a link—or any of the four elements—is an issue for the district court to decide upon remand.  And the district court retains the discretion to allow Appellants to amend their complaint if "justice so requires."  Fed. R. Civ. P. 15(a)(2).  In short, we vacate that portion of the district court's dismissal order addressing Appellants' pre-assault claim and remand for further proceedings.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**  Each party shall bear its own costs on appeal.