**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAUL DURHAM MORGAN,
                            *Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,
                            *Respondent.*

No. 05-74378

Agency No.
A24-299-945

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
March 8, 2007—Phoenix, Arizona

Filed July 26, 2007

Before: Michael Daly Hawkins, Sidney R. Thomas, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Thomas

9079

## COUNSEL

Nicomedes E. Suriel, Phoenix, Arizona, for the petitioner.

Peter D. Keisler, Assistant Attorney General, Civil Division, David V. Bernal, Assistant Director, Office of Immigration Litigation, Andrew C. MacLachlan, Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

## OPINION

THOMAS, Circuit Judge:

This appeal presents the question of whether the United States is estopped from removing an aggravated felon because the government allegedly agreed not to deport him in exchange for his cooperation in a federal drug prosecution. Under the circumstances presented by this case, we deny the petition for a writ for review.

I

Paul Durham-Morgan is a native and citizen of England who entered this country as a non-immigrant visitor on November 8, 1981. He was authorized to remain until December 7, 1981, but exceeded his authorization. In early 1982, Morgan was arrested and charged with various drug trafficking offenses. He was then served with an Order to Show Cause charging him as being subject to deportation for overstaying his visa. In October 1982, Morgan was convicted of conspiracy to illegally import a controlled substance in violation of 21 U.S.C. §§ 952, 960 and 963; conspiracy to possess a controlled substance with intent to distribute in violation of 21 U.S.C. §§ 846 and 841(a)(1); conspiracy to travel in interstate and foreign commerce in aid of racketeering enterprises in violation of 18 U.S.C. §§ 371 and 1952(a)(3)(A); and travel in interstate commerce in aid of racketeering enterprises in violation of 18 U.S.C. § 1952(a)(3)(A). He was sentenced to five years imprisonment, but the sentence was suspended subject to five years of probation. He was released into the custody of the then-Immigration and Naturalization Service ("INS") and was subsequently released under a bond in January 1983.

Morgan asserts that he then entered into a cooperation agreement with the government wherein he agreed to testify in support of the U.S. Attorney's prosecution of a major drug

case in Montana in exchange for certain promises regarding his immigration status. In March 1983, then-U.S. Attorney for the District of Montana Pete Dunbar[1] authorized a written request to the Helena, Montana, office of the INS to transfer Morgan's case from the San Diego Office of the INS and to grant Morgan employment authorization so he could support himself and his wife while helping the U.S. Attorney with his investigation and prosecution. Dunbar authorized a similar letter to the San Diego office of the INS in April 1983.

Dunbar substantiated in an affidavit that Morgan was cooperating with authorities, as he alleged. However, Dunbar did not indicate in the affidavit that there was an explicit quid pro quo agreement wherein he agreed to testify in exchange for a grant of permanent residence in the United States. Dunbar described Morgan and his wife as "absolute[ly] necessary key witnesses in one of the most important narcotics cases to arise in the State of Montana." Dunbar also stated in his letter to the INS District Director in Montana that "[i]t is necessary that [Morgan's wife's] visitor permit be extended" and that "[w]e do not have an indictment let alone a trial date in this case so it is difficult to predict how long it will be necessary to continue this proposed arrangement." Morgan's case was transferred to Montana, and the government concedes that Morgan was subsequently issued a Form I-94 with employment authorization. However, neither Dunbar nor Morgan affirm that there was an explicit promise to Morgan of permanent residence in exchange for his testimony.

Morgan asserts that the government contacted him again in February 1987 to ascertain his status. In this letter, the government acknowledged that Morgan had been granted permis-

---

[1]We note with regret the death of former U.S. Attorney Byron H. "Pete" Dunbar on June 5, 2007. His lifetime of public service culminated in his appointment as U. S. Attorney for the District of Montana in 1981 by President Ronald Reagan. He served with great distinction in that position until 1990.

sion to remain in the United States on a "temporary basis." The parties do not dispute that no action was taken by the government between February 1987 and December 2000. In December 2000, the INS served Morgan with notice that his removal proceedings were being recommenced. In May 2001, the government issued a form I-261 against Morgan, alleging that his 1982 conviction constituted additional grounds for deportation.

Through counsel, Morgan then sought to obtain an S visa to remain in the United States. The so-called "S visa" derives from 8 U.S.C. § 1101(a)(15)(S), which gives the Attorney General authority to grant a nonimmigrant visa to a person "in possession of critical reliable information concerning a criminal organization or enterprise . . . [who] . . . has supplied such information to Federal or State law enforcement authorities or a Federal or State court; and whose presence in the United States the Attorney General determines is essential to the success of an authorized criminal investigation . . . ." The Attorney General may adjust the status of an S visa holder to permanent resident if, in his opinion, the information provided by the alien "has substantially contributed to the success" of an investigation or prosecution. 8 U.S.C. § 1255(j). A request for an S visa "may only be filed by a federal or state [law enforcement agency]" through the filing of a Form I-854, which is then submitted for discretionary approval by the proper government officers as detailed in 8 C.F.R. § 214.2(t)(4).

Morgan's lawyer wrote to several government employees involved in the Montana prosecution on which Morgan cooperated, asking for assistance in obtaining an S visa for Morgan. These efforts were unsuccessful. Though Dunbar provided Morgan with an affidavit attesting to Morgan's assistance in the prosecution, Morgan claims the remainder of the agencies he contacted were unable to help either because they did not possess records going back that far or because the

officials involved in Morgan's case were no longer working for the government.

Unable to induce an agency into granting an actual S visa, Morgan then asked the immigration judge ("IJ") to grant him a "constructive S visa" because, he claimed, he met all the requirements. The IJ stated that he lacked jurisdiction to issue a "constructive S visa" — only an authorized Law Enforcement Agency could do that. The IJ, acknowledging that this was a novel remedy although not entirely unsympathetic to it, asked if Morgan was going to pursue it further in district court. Morgan's counsel answered, "Right. I'm going to exhaust all administrative remedies." Morgan's counsel explained at that time that "[t]his is a case where we're going to be continuing with appeals raising due process and constitutional claims. We're going to be following *Matter of Thomas* as well as a written coram nobis in district court." In July 2003, the IJ sustained the factual allegations and charges that Morgan had overstayed his visa, was guilty of an aggravated felony and was convicted of a controlled substances offense. The IJ then ordered Morgan deported to England.

Morgan appealed the IJ's decision to the BIA. Before the BIA, he argued that he was either (1) entitled to a constructive S visa, or (2) entitled to remand to the IJ "due to the ineffective assistance of his former criminal defense attorney by not filing for a Judicial Recommendation Against Deportation (JRAD), which would have made [Morgan] eligible for certain forms of relief from removal." The BIA dismissed his appeal, holding that "jurisdiction to grant an S visa lies with the Department of Homeland Security . . . not with the Immigration Judge" and that Morgan's ineffective assistance of counsel claim "would lie with the criminal courts, not with the Immigration Judge." Finally, the BIA stated "with respect to the respondent's constitutional arguments, we note that, as a general rule, this Board is without jurisdiction to entertain such arguments."

In April 2005, Morgan filed a petition for a writ of habeas corpus in the United States District Court for the District of Arizona. Upon motion of the government and pursuant to the REAL ID Act § 106(c), the district court transferred the action as a petition for review to this Court.

## II

**[1]** The government argues that we lack jurisdiction over Morgan's due process and equitable estoppel claims because he did not raise them before the agency and they are therefore unexhausted. Morgan does not claim to have raised these challenges before the IJ or BIA, and for good reason. The agency has no power to grant relief on estoppel or substantive due process claims, and accordingly, we have never required petitioners to exhaust claims of this nature before the agency. *Padilla-Padilla v. Gonzales,* 463 F.3d 972, 977 (9th Cir. 2006); *Wang v. Reno*, 81 F.3d 808, 814 (9th Cir. 1996).[2] Morgan thus did not fail to raise his due process and equitable estoppel claims before the BIA and is not barred from raising them here for the first time, and we have jurisdiction to consider them.

## III

**[2]** Prior to the Real ID Act, when a petitioner sought to raise substantive due process challenges like Morgan's or other challenges over which the agency lacked jurisdiction or the power to grant relief, the petitioner would file a habeas petition in federal district court. *See, e.g.*, *Alfaro-Reyes v. INS*, 224 F.3d 916, 921 (9th Cir. 2000) (noting "the availability of habeas review" for deportation cases involving "claims of . . .

---

[2]The exception to the rule that constitutional claims need not be exhausted before the agency are claims of denial of procedural due process by the IJ, which must be raised before the BIA because the agency does have the power to adjudicate procedural due process claims. *See, e.g.*, *Sun v. Ashcroft*, 370 F.3d 932, 944 n.18 (9th Cir. 2004).

constitutional violations"). If any factual matters needed to be resolved, the district court would hold the necessary hearings, admit any relevant evidence, and resolve them. Pursuant to the Real ID Act, however, jurisdiction over habeas petitions challenging final orders of removal is vested "sole[ly]" in the Courts of Appeal; district courts no longer have habeas jurisdiction over such petitions. *See Alvarez-Barajas v. Gonzales*, 418 F.3d 1050, 1052 (9th Cir. 2005).

This jurisdictional transfer presents procedural difficulties in adjudicating habeas petitions involving colorable legal claims that cannot be asserted before the agency. Petitioners raising viable legal claims are entitled to an evidentiary hearing, *see Ibarra-Flores v. Gonzales*, 439 F.3d 614, 620 (9th Cir. 2006); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000), but the Courts of Appeal are unable to provide one, *see Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1237 (11th Cir. 2006) ("[I]t is not the role of appellate courts to make findings of fact.") (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

On occasion, we have resolved this problem by transferring the case to the district court for fact-finding under 28 U.S.C. § 2347(b)(3), "which authorizes such a transfer when an agency has not held a hearing before taking the complained-of action, and 'when a hearing is not required by law and a genuine issue of material fact is presented.' " *See Gallo-Alvarez v. Ashcroft*, 266 F.3d 1123, 1129 (9th Cir. 2001) (quoting 28 U.S.C. § 2347(b)(3)) (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 496-97 & n.2 (1999) (Ginsburg, J., concurring)).

**[3]** While this option remains open to us, we need not avail of it unless the petitioner has alleged a colorable claim upon which relief might be granted. In the habeas context, an evidentiary hearing is only required if (1) the petitioner's allegations, if proven, would constitute a colorable constitutional claim, and (2) the state court trier of fact has not reliably

found the relevant facts after a full and fair hearing. *See Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998). Because it is clear that Morgan has not yet had a full and fair hearing on the facts of his instant claims, the question before us is whether the facts he has alleged, if proven, make out colorable claims for either a due process violation based on estoppel principles or a substantive due process violation under the state-created danger doctrine.

A

**[4]** Morgan contends that his due process rights were violated because the government promised him relief from deportation if he would cooperate in a drug prosecution. As a general matter of fundamental fairness, promises made by the government to induce either a plea bargain or a cooperation agreement must be fulfilled. *See Johnson v. Lumpkin*, 769 F.2d 630, 633 (9th Cir. 1985) (citing *Santobello v. New York*, 404 U.S. 257, 262-63 (1971)). The agreement, however, must be made by a government official authorized to make it and the promisee must rely on it to his detriment. *Thomas v. INS*, 35 F.3d 1332, 1337 (9th Cir. 1994). A United States Attorney is authorized to enter into cooperation agreements and, in so doing, to make promises that are binding on other Federal agencies. *Id.* at 1340 (U.S. Attorney could bind INS).

**[5]** However, in this case, Morgan has not alleged that an actual, explicit promise was made to him or, if one was, what the precise terms of that promise were. Although he argues correctly that a United States Attorney has the power to make promises to an alien that are binding on the government, nowhere in his brief or petition does he state that either the U.S. Attorney or anyone else actually made an explicit promise that he would be granted permanent residence in exchange for his cooperation. All he alleges is that he "agreed to testify in support of the United States prosecution of a major drug case in the State of Montana" and that U.S. Attorney Dunbar arranged for the transfer of Morgan's immigration proceed-

ings from California to Montana, and arranged for Morgan and his wife to receive employment authorization. Morgan further clarifies that "[t]he government did not specify a fixed period when [his] employment authorization would expire," and "grant[ed him] permission to remain in the United States *on a temporary basis*." (emphasis added). Morgan then states that based on these actions, "it was not unreasonable for [him] to believe that his cooperation with the government meant that he would be allowed to remain in the United States."

**[6]** Because Morgan has not alleged that an actual promise was made, he has not stated a colorable claim that his due process rights were violated under the *Santobello* doctrine. Even if everything he alleges is found to be true at an evidentiary hearing, it would not prove that the government's attempt to remove him is in breach of an explicit term of his cooperation agreement. That Morgan believed he would be allowed to remain in the United States indefinitely is not the same as being explicitly promised as much by an authorized agent of the U.S. government. Nor is there any external evidence of a promise. Dunbar's affidavit says nothing about having made any explicit promise granting Morgan permanent residency in the United States in exchange for his cooperation.

**[7]** Under the circumstances, an evidentiary hearing on Morgan's *Santobello* due process claim is unwarranted. Evidentiary hearings in this context, as in habeas, are not meant to be "fishing expeditions for . . . petitioners to explore their case in search of its existence." *Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (internal quotations omitted). Nor are petitioners such as Morgan automatically entitled to discovery absent evidence that their claims are colorable. *Id.* at 1068. Because Morgan has not alleged that an explicit promise was made and because the only evidence he has tendered suggests that no such promise was made, we decline to exercise our transfer power to grant an evidentiary hearing on the basis of this theory of relief.

B

Morgan argues in the alternative that even if no express promise of permanent residence was made, the government's actions—specifically, its delay in seeking to remove him—reasonably led him to believe that he would be permitted to remain in the United States indefinitely and thus the government should be equitably estopped from attempting to remove him.

**[8]** "A party seeking to raise estoppel against the government must establish affirmative misconduct going beyond mere negligence; even then, estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir. 1989) (en banc) (internal quotations and alteration in original omitted). "[E]stoppel against the government is unavailable where petitioners have not lost any rights to which they were entitled." *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000). When estoppel is available, the court then considers its traditional elements, which include that "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Watkins*, 875 F.2d at 709.

**[9]** Here, Morgan's only claim of affirmative misconduct is the extreme delay of the INS in seeking to remove him. In *Jaa v. INS*, 779 F.2d 569 (9th Cir. 1986), we considered whether delay by the INS of 58 months was enough to constitute affirmative misconduct. We held that there was no evidence that the government's delay was on account of anything other than neglect and that "[n]eglect will not support estoppel." *Id.* at 572. Likewise, there is no apparent reason for the government's delay here except neglect. If anything, the government

did not follow up on Morgan's case sooner because immigration authorities were told that his cooperation with the U.S. Attorney in Montana could last for an indefinite period of time.[3]

The case Morgan cites, *Yoo v. INS*, 534 F.2d 1325 (9th Cir. 1976), holds only that INS delay can amount to affirmative misconduct when the INS had a clear duty to act and its not acting deprived the alien of a right to relief. *Id.* at 1328-29. Here, the INS was under no clear duty to deport Morgan, nor did he have a right to relief.

**[10]** Morgan's allegations do not amount to a constitutional violation even if true. Accordingly, there is no genuine issue of material fact warranting a transfer and hearing.

C

Morgan also contends that removal to England would violate his substantive due process rights under the state-created danger doctrine.

**[11]** As a general rule, the government is not liable for the actions of third parties. *See Deshaney v. Winnebago County*, 489 U.S. 189, 195-96 (1989). This rule is modified by two exceptions: "(1) the 'special relationship' exception; and (2) the 'danger creation' exception." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992). The special relationship exception comes, as its name suggests, from when the government enters into a special relationship with a party, such as taking the party into custody or placing him into involuntary hospi-

---

[3]We need not decide today whether under extreme circumstances, negligent delay could constitute grounds for estoppel. We hold only that on these facts, where Morgan entered the United States as an adult, engaged in drug trafficking, cooperated with the government and was then not pursued for removal for at least thirteen years because immigration authorities were either neglectful or still under the impression that his cooperation with drug prosecutions was ongoing, the equities do not support Morgan's estoppel claim.

talization. *Id.* The danger creation exception arises when "affirmative conduct on the part of the state" places a party in danger he otherwise would not have been in. *Id.*

We have repeatedly held that government agents may be liable for affirmative conduct placing a party in a danger of the government's creation even though the general rule is that the Fourteenth Amendment does not impose a duty on government officers to protect individuals from third parties. *See, e.g.*, *Munger v. City of Glasgow*, 227 F.3d 1082 (9th Cir. 2000) (permitting § 1983 suit against police officers who forced drunk bar patron outside in only jeans and a tee-shirt in subzero conditions leading to his death from hypothermia); *Grubbs*, 974 F.2d at 127 (permitting § 1983 suit against state employees who placed a female employee into a situation with a known violent sex offender who raped her); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) (permitting § 1983 suit against police officers who stranded woman in high-crime area in which she was subsequently raped).

**[12]** The state-created danger doctrine may also be invoked to enjoin deportation. *See Wang*, 81 F.3d at 818-19. In *Wang*, U.S. officials arranged to bring a Chinese citizen to the United States to testify in a heroin case. *Id.* at 811-12. Wang had previously been tortured by Chinese officials in order to get him to falsely implicate another suspect for which they generously promised Wang leniency on charges stemming from his own involvement in the drug transaction. *Id.* at 811. When Wang came here, however, after U.S. officials had misled both him and the Chinese, he was forced into the Hobson's choice of testifying truthfully under oath here and losing his Chinese leniency and risking further torture upon his return, or perjuring himself here. *Id.* at 813. After U.S. officials created this situation and forced Wang into this choice, they then sought to return him to China where there was a high likelihood he would be tortured for his truthful testimony here. *Id.* at 819. The district court found that the government's behavior shocked the conscience and also that the government had cre-

ated the dangerous predicament Wang was in. *Id.* at 819. It permanently enjoined the Attorney General from returning Wang to China. *Id.* at 812-13. In affirming, we found that the government had entered into a special relationship with Wang by taking him into custody and then engaged in "gross negligence and deliberate indifference" in creating the danger that Wang would "likely be tortured" if returned to China. *Id.* at 818-20. We held that the district court properly exercised its supervisory power to remedy the "extraordinary nature of the government's misconduct," by enjoining the government from returning Wang to China. *Id.* at 820.

**[13]** Here, however, Morgan does not allege anything approaching the kind of affirmative government misconduct found in *Wang*. He argues that were he returned to England, former associates from his drug-running days twenty-five years past would be likely to take their revenge on him for his cooperation with U.S. authorities. Even on the facts as he asserts them, there is no suggestion that the government, in entering into a cooperation agreement with him and then seeking to remove him to England, has acted with "gross negligence and deliberate indifference." Unlike in *Wang*, there is no suggestion that the English government would be unwilling and unable to protect him. Nor has Morgan alleged that U.S. officials engaged in serious misconduct by either deceiving him or coercing his testimony.

Although Morgan seeks an evidentiary hearing to develop the factual basis for his claim, the arguments he has put forth are insufficient to warrant him protection under the state-created danger doctrine even were he to prove everything he has alleged. Accordingly, there is no genuine issue of material fact and we opt not to transfer this case to the district court for further fact finding.

## IV

**[14]** In sum, because Morgan has not alleged a colorable claim for equitable estoppel or violation of his substantive

constitutional rights, his case does not warrant transfer to the district court for further fact finding under 28 U.S.C. § 2347(b)(3). We deny the petition for review.

**PETITION DENIED.**