136 Nev., Advance Opinion 82

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| CLARK COUNTY SCHOOL DISTRICT (CCSD), Appellant, vs. MARY BRYAN, MOTHER OF ETHAN BRYAN; AND AIMEE HAIRR, MOTHER OF NOLAN HAIRR, Respondents. | No. 73856 **FILED** DEC 2 4 2020 ELIZABETH A. BROWN CLERK OF SUPREME COURT BY_____ DEPUTY CLERK |
| CLARK COUNTY SCHOOL DISTRICT (CCSD), Appellant, vs. MARY BRYAN, MOTHER OF ETHAN BRYAN; AND AIMEE HAIRR, MOTHER OF NOLAN HAIRR, Respondents. | No. 74566 |

Consolidated appeals from a district court judgment and post-judgment attorney fees award in a civil rights action. Eighth Judicial District Court, Clark County; Nancy L. Allf, Judge.

*Reversed and remanded with instructions.*

Lewis Roca Rothgerber Christie LLP and Joel D. Henriod, Daniel F. Polsenberg, Dan R. Waite, Brian D. Blakley, and Abraham G. Smith, Las Vegas,
for Appellant.

Allen Lichtenstein, Ltd., and Allen Lichtenstein, Las Vegas; Scott Law Firm and John Houston Scott, San Francisco, California,
for Respondents.

BEFORE HARDESTY, STIGLICH and SILVER, JJ.

## OPINION

By the Court, SILVER, J.:

The plaintiffs below raised Title IX and 42 U.S.C. § 1983 claims against a school district for student-on-student harassment after two sixth-graders targeted classmates Nolan and Ethan with sexual slurs, other insults, and physical assaults in the fall of 2011. Nolan's and Ethan's mothers reported the harassment and the physical assaults to the school in September and again in October, but school administrators failed to conduct an official investigation as required by NRS 388.1351 or to prevent continued harassment. Nolan and Ethan eventually withdrew from the school, and their parents (collectively Bryan) later filed the underlying lawsuit. The district court found for Bryan on both their Title IX and § 1983 claims following a bench trial.

On appeal, the school district contests nearly every element of the district court's decision, beginning with whether the harassment was "on the basis of sex," as required for a Title IX claim. Recently the United States Supreme Court ruled that Title VII's prohibition against discrimination "because of . . . sex" extends to homosexual and transgender individuals. *Bostock v. Clayton Cty.*, ___ U.S. ___, 140 S. Ct. 1731 (2020). Applying *Bostock*'s reasoning to the analogous language in Title IX prohibiting harassment "on the basis of sex," we first conclude sufficient facts support a claim under Title IX.

The school district also challenges the district court's sole reliance on the violation of state law to satisfy "deliberate indifference," an essential element of both the Title IX and § 1983 claims. Although the state law violation is a factor in determining deliberate indifference, it does not constitute *per se* deliberate indifference under federal law. We therefore reverse the judgment in Bryan's favor on both claims and remand for further findings on the Title IX claim.



## FACTS

In the fall of 2011, Nolan and Ethan were sixth-graders at Greenspun Junior High, where they played the trombone in band class. Fellow trombone player C., along with his friend D., bullied Nolan by calling him homophobic names and touching his shoulder-length blond hair. In mid-September, C., who sat next to Nolan in band, called Nolan a tattletale and stabbed him in the groin with a pencil, commenting he wanted to know if Nolan was a boy or a girl. Nolan, who had reported C.'s harassment to the dean a few days earlier, believed C. was retaliating for that report.

Nolan and Ethan were friends, and Nolan told Ethan about the incident. Ethan's mother, Mary, overheard the boys talking and thereafter obtained the details from Ethan. On September 15, Mary emailed the band teacher and school counselor to report the bullying and the pencil-stabbing incident, but she did not mention the homophobic slurs. Mary attempted to include Principal Warren McKay on the email but misspelled his email address. The band teacher spoke with C. and D. and rearranged the trombone section, and the school counselor met with Nolan, who stated he was fine.

Nolan's mother, Aimee, learned about the stabbing incident for the first time on September 21. Aimee spoke with both the dean and the vice principal on September 22. She told the vice principal that C. had assaulted Nolan by stabbing him in the genitals while asking "if [Nolan] was a little girl." The school counselor again met with Nolan and walked Nolan to the dean's office, encouraging him to file a report of the stabbing and other bullying. Nolan filed a report stating that C. was messing with his hair, blowing air in his face, kicking his instrument, and calling him and other students names like "duckbill Dave." Nolan did not report the stabbing or the homophobic slurs. The dean met with C. and his mother in

Supreme Court
OF
Nevada


(O) 1947A

3

late September to discuss the school's hands-off policy for students and to prohibit C. from name-calling.

C. and D. nevertheless continued to harass Nolan by calling him names and bumping into him as he entered or exited the band room. C. and D. also began targeting Ethan and Nolan jointly, calling them "faggots" and teasing them about being boyfriends and engaging in sexual conduct with each other. Nolan and Ethan later testified they did not identify as homosexual, nor did they believe others at Greenspun thought they were homosexual, despite the homophobic slurs.

On October 18, C. scratched Ethan on the leg with a trombone. Ethan told Mary of the incident and that C. had continued to say that Nolan and Ethan were boyfriends and faggots. Mary recalled Ethan reporting, for example, that C. had asked Ethan whether he was learning about shoving staffs "up people's asses so that you can jerk each other off" and "putting penises in somebody's ass."

Mary emailed Principal McKay and the school counselor again on October 19—although she again misspelled Principal McKay's email address. Mary reported the trombone-scratching incident and referenced the September 15 email, reiterating that C. and D. continued to bully Ethan and Nolan. As in her prior email, she omitted mention of the homophobic conduct. The school counselor forwarded the email to the dean. Mary also met with the dean on October 19, telling her of the full extent of the harassment, including the homophobic slurs.

C. and D. continued to call Ethan and Nolan names. Nolan began to withdraw and show signs of stress. Ethan began contemplating suicide. Nolan and Ethan began avoiding class and eventually stopped going to school. The boys withdrew from Greenspun in early 2012 and thereafter enrolled in private schools. Mary sent a third email on February 7 to school administrators and the school district, detailing the

Supreme Court
OF
Nevada

(O) 1947A

homophobic slurs and the sexual nature of the harassment. Principal McKay suspended C. and D. at the direction of district supervisors.

Mary and Aimee filed the underlying lawsuit, which proceeded to trial against Clark County School District (CCSD) on a Title IX claim under 20 U.S.C. § 1681 and a civil rights claim under 42 U.S.C. § 1983.[1] The district court presided over a five-day bench trial during November 2016. The CCSD employees generally testified that they believed at least one of Greenspun's administrators had investigated both the September and October reports, and that they did not know of the homophobic nature of the bullying until after Nolan and Ethan withdrew from school. But the CCSD employees gave varied testimony regarding the administrators' exact response to the September and October reports, and no administrator could recall conducting an investigation complying with NRS 388.1351 (2011),[2] the statute governing bullying complaints.

The district court found CCSD liable for student-on-student harassment under both Title IX and § 1983. In its two written orders, the district court focused on the school's failure to conduct any investigation, let alone one as required by Nevada law under NRS 388.1351, when the bullying occurred. The court awarded physical and emotional distress damages of $600,000 apiece to Nolan and Ethan, $50,000 apiece for the cost of alternative schooling over five years, and attorney fees and costs.

CCSD now appeals.

## DISCUSSION

CCSD contests the district court's decision as to nearly every element of the Title IX and § 1983 claims and further contests the awards

---

[1]We focus only on the claims and parties that proceeded to trial and do not address the dismissed claims and parties.

[2]All references to this statute refer to the 2011 version.

for damages and attorney fees. While the students' harassment is disturbing and the administrators' response deficient under NRS 388.1351, we are constrained to follow federal law governing Title IX and § 1983 claims for student-on-student harassment, which allows for the recovery of damages only in very narrow circumstances. We first address the Title IX claim and remand for findings regarding deliberate indifference under the applicable law. We then address the § 1983 claim and reverse the decision as to that claim.

*Title IX*

Title IX is a federal civil rights law enacted in 1972 that provides the following: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (2012) (Title IX).

The first requirement for imposing Title IX liability is that the harassment be "on the basis of sex." *Id.* For liability to attach to a school district in cases of student-on-student harassment, the plaintiff must also show that the school exercised substantial control over the harasser and the situation, the harassment was so severe as to deprive the plaintiff of educational opportunities, a school official with authority to correct the situation had actual knowledge of the harassment, and the school was deliberately indifferent to the known harassment. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (relying on *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)). We address these elements in turn.

*The harassment fell within the purview of Title IX*

The district court based Title IX liability upon perceived sexual orientation harassment, finding the bullying was sexual in nature due to

Supreme Court
of
Nevada

(O) 1947A

6

the homophobic name calling.[3] On appeal, CCSD contends that the bullying was "sexually tinged" but was not sexual harassment under Title IX because Nolan and Ethan testified they were not homosexual and the evidence showed the bullying was retaliatory.

In addressing this issue, we may look to Title VII, as the prohibition there is substantially similar to Title IX's prohibition and courts have frequently looked to Title VII jurisprudence to interpret Title IX's antidiscrimination provision. *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (explaining that caselaw interpreting Title VII "guides our evaluation of claims under Title IX"); *Adams v. Sch. Bd. of St. Johns Cty.*, 968 F.3d 1286, 1305 (11th Cir. 2020) (using caselaw interpreting Title VII to address whether a school's bathroom policy discriminated against transgender status in violation of Title IX because both titles prohibit discrimination based on sex and use a but-for causation standard); *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012) (explaining the legislative history of Title IX implies Congress intended that legislation to have substantive standards similar to Title VII).

We recognize that, at the time this appeal was filed, there was substantial conflicting law regarding whether Title IX's protections extended to homosexual and transgender individuals or protected against perceived sexual orientation harassment. *Compare Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 115 (2d Cir. 2018) (broadly construing Title VII based on the statute's language and concluding that "because sexual

---

[3]The district court's findings on this point are limited. We caution district courts in the future to make express, detailed findings on this point in order to clarify their reasoning and, if necessary, facilitate appellate review. *See, e.g., Jitnan v. Oliver*, 127 Nev. 424, 433, 254 P.3d 623, 629 (2011) (recognizing that a lack of findings supporting the district court's decision hampers meaningful appellate review, even when such review is deferential, "because [the appellate court is] left to mere speculation").

orientation discrimination is a function of sex, and is comparable to sexual harassment, gender stereotyping, and other evils long recognized as violating Title VII, the statute must prohibit it"), *with Tumminello v. Father Ryan High Sch., Inc.*, 678 Fed. Appx. 281, 285-86 (6th Cir. 2017) (addressing Title IX and concluding the plaintiff's allegations of sexual orientation discrimination did not amount to a viable sex-stereotyping claim).

In deciding the question of whether the harassment here was "on the basis of sex" within the purview of Title IX, we are aided by the United States Supreme Court's recent Title VII decision in *Bostock v. Clayton County*, ___ U.S. ___, 140 S. Ct. 1731 (2020). *See, e.g., Grimm*, 972 F.3d at 616 (applying *Bostock* to evaluate a Title IX claim); *Adams*, 968 F.3d at 1305 (using *Bostock* to address a Title IX violation).

In *Bostock*, the Supreme Court addressed whether Title VII prohibited employers from firing employees "simply for being homosexual or transgender." ___ U.S. at ___, 140 S. Ct. at 1737. Title VII provides that an employer may not lawfully discharge an employee "because of such individual's . . . sex." *Id.* at ___, 140 S. Ct. at 1738 (quoting 42 U.S.C. § 2000e-2(a)(1) (Title VII)). The Court explained that "the ordinary meaning of 'because of' is 'by reason of' or 'on account of,'" and that the statute's language therefore incorporated a "but-for causation" standard. *Id.* at ___, 140 S. Ct. at 1739 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013)). The Court recognized that, under this "sweeping standard," more than one factor could lead to the discrimination and held that "[s]o long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.* at ___, 140 S. Ct. at 1739. The Court then addressed the question of what constitutes discrimination under Title VII, holding that "an employer who intentionally treats a person worse because of sex . . . discriminates against that person in violation of Title VII." *Id.* at ___, 140 S. Ct. at 1740. In reaching its conclusion, the Court

noted that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at ___, 140 S. Ct. at 1741.

*Bostock* clarifies that Title VII prohibits employment discrimination against transgender and homosexual individuals. Turning to Title IX, and applying *Bostock*'s reasoning, we conclude that Title IX's prohibition of discrimination "on the basis of sex" likewise encompasses discrimination against homosexual or transgender individuals. *See Grimm*, 972 F.3d at 616-17 (construing Title IX as encompassing discrimination against transgender individuals pursuant to *Bostock*). It follows that harassment based upon perceived sexual orientation also falls under Title IX, as in both situations the perpetrator's view of the victim's sexual orientation is a factor motivating the harassment. *See Zarda*, 883 F.3d at 112 (explaining that "sexual orientation discrimination is predicated on assumptions about how persons of a certain sex can or should be"); *see also Bostock*, ___ U.S. at ___, 140 S. Ct. at 1739-40 (explaining Title VII is triggered where an employer "intentionally treats a person worse because of sex"). Thus, regardless of whether the harassment arises from the person's actual sexual orientation or perceived sexual orientation, the harassment is prohibited by Title IX. *See, e.g.*, *Bostock*, ___ U.S. at ___, 140 S. Ct. at 1739-40; *Zarda*, 883 F.3d at 112.

Following a bench trial, the district court here found that Nolan and Ethan were harassed because of their perceived sexual orientation. Unlike cases dismissed for failure to state a claim or resolved on summary judgment, which we review completely de novo, here we only review issues of law de novo and give deference to the district court's factual findings that are supported by substantial evidence in the record. *See, e.g.*, *Weddell v. H2O, Inc.*, 128 Nev. 94, 101, 271 P.3d 743, 748 (2012) (explaining we will uphold factual findings so long as they are supported by substantial

evidence and not clearly erroneous, but will review legal issues de novo); *see also Pack v. LaTourette*, 128 Nev. 264, 267, 277 P.3d 1246, 1248 (2012) (reviewing a dismissal for failure to state a claim de novo); *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005) (reviewing summary judgment de novo). "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion." *Weddell*, 128 Nev. at 101, 271 P.3d at 748 (quoting *Whitemaine v. Aniskovich*, 124 Nev. 302, 308, 183 P.3d 137, 141 (2008)).

With those standards in mind, we conclude substantial evidence supports the district court's finding. Although testimony supported that Nolan and Ethan were neither gay nor perceived as gay by C. and D., it was within the district court's discretion to weigh this testimony against the other evidence at trial and determine the evidence as a whole nevertheless established perceived sexual orientation harassment—harassment on the basis of sex—within the meaning of the statute. In particular, we note the continual homophobic slurs, including those that went far beyond mere name-calling and described specific sex acts. We also note that C. and D. touched Nolan's long, blond hair as part of the harassment and, on one occasion, stabbed Nolan in the genitals while questioning his gender. Further, C. and D. targeted Nolan and Ethan jointly for their alleged sexual relationship. These facts support that the harassment was motivated, at least in part, by perceived sexual orientation and therefore falls within the purview of Title IX. *See, e.g., Bostock*, ___ U.S. at ___, 140 S. Ct. at 1739-40 (explaining that, so long as sexual discrimination is one of the motivations behind the harassment, the harassment falls under Title VII).

*The school exercised substantial control over the harasser and the situation*

The district court found that CCSD had substantial control, since the harassment occurred during band class. This prong is typically established where the misconduct occurs at school and during school hours. *See Davis*, 526 U.S. at 646. The facts establish this prong, as the harassment occurred while the boys were at school, and CCSD does not challenge this point on appeal.

*The harassment was so severe as to deprive the plaintiff of educational opportunities*

The district court found that the harassment deprived Nolan and Ethan of their educational opportunities where both boys suffered emotional distress, skipped band class, and eventually left school. CCSD argues that the harassment was not so severe, pervasive, and objectionably offensive as to deprive the boys of their educational opportunities or to have a concrete, negative effect on the boys' education. CCSD points out that Ethan and Nolan testified they were not prevented from participating in school activities and both did well academically.

Under this factor, "the plaintiff [must] suffer[ ] 'sexual harassment . . . that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Reese*, 208 F.3d at 739 (alteration in original) (quoting *Davis*, 526 U.S. at 650). The Supreme Court and the Ninth Circuit have cautioned that "simple acts of teasing and name-calling," even if gendered, will not warrant Title IX liability. *Id.* (quoting *Davis*, 526 U.S. at 652). The Supreme Court has also explained that "in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Davis*, 526 U.S. at 651-52. Thus, in considering this prong, courts should "bear in mind that schools are unlike the adult workplace and that

(O) 1947A

children may regularly interact in a manner that would be unacceptable for adults," such that "[d]amages are not available for simple acts of teasing and name-calling among school children . . . even where these comments target differences in gender." *Reese*, 208 F.3d at 739 (alterations in original) (quoting *Davis*, 526 U.S. at 651-52).

While the record does not reflect that the district court here expressly considered the schoolroom setting or that the harassers were minors, we nevertheless conclude the record contains sufficient evidence to support the district court's finding. The conduct at issue here went far beyond mere insults and banter—the language was ugly, pervasive, and resulted in a serious physical assault. Although the evidence suggested the boys did well academically despite the harassment, the facts nevertheless demonstrate that Nolan began skipping band and other classes and eventually skipped school, while Ethan began faking illness to stay home and contemplating suicide. We therefore conclude substantial evidence supports that the boys were denied educational opportunities as a result of the harassment. *See Davis*, 526 U.S. at 654 (suggesting this element is satisfied where the harassment has a "concrete, negative effect" on the victim's ability to participate in the educational program).

*A school official with authority to correct the situation had actual knowledge of the harassment*

The district court found that the collective complaints and discussions with Mary and Aimee put CCSD on notice of the bullying and "should have prompted a mandatory investigation." CCSD on appeal contends it did not have actual knowledge of the continuing harassment because Nolan and Ethan concealed the harassment.

This prong requires that a school "official 'who at a minimum has authority to address the alleged discrimination and to institute corrective measures'" have "actual knowledge of the discrimination." *Reese*,

208 F.3d at 739 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

The parties introduced substantial conflicting evidence regarding the extent to which Greenspun administrators knew of the ongoing sexual harassment. The CCSD employees all denied knowing of the sexual slurs until after the boys left school and, to varying degrees, denied knowing details of the physical and nonsexual harassment. But Nolan's mother, Aimee, testified to telling school administrators on September 22 that C. had stabbed Nolan in the genitals while asking if Nolan was a girl. Moreover, Ethan's mother, Mary, testified to reporting the full details of the harassment to the dean on October 19. We will not disturb the district court's determination that the parents were more credible than the school district employees on this fact. *See Weddell*, 128 Nev. at 101, 271 P.3d at 748; *Ellis v. Carucci*, 123 Nev. 145, 152, 161 P.3d 239, 244 (2007) (acknowledging the conflicting evidence presented on an issue of fact and noting, "we leave witness credibility determinations to the district court and will not reweigh credibility on appeal"). And, because the administrators had the ability to address the bullying and institute corrective measures, we conclude CCSD had actual notice for purposes of Title IX. *See, e.g., Reese*, 208 F.3d at 739.

*Further findings are necessary to establish deliberate indifference*

As to the deliberate indifference element, the district court determined it had been satisfied because Greenspun administrators violated state law by failing to investigate the complaints. The court particularly faulted them for failing to comply with NRS 388.1351(2), which, at the time, required a school, upon learning of a bullying incident, to "initiate an investigation not later than 1 day after receiving notice" and

Supreme Court
OF
Nevada

(O) 1947A

to complete the investigation within 10 days.[4] The court found that the administrators undertook "no investigation, much less one conforming to statute," in 2011, and that this failure was "significant evidence of an overall posture of deliberate indifference toward Ethan's and Nolan's welfare." The parties vehemently disagree over whether the facts establish deliberate indifference—most notably, about whether the failure to investigate as required by state statute established *per se* deliberate indifference under federal law.

To succeed on a Title IX claim, a plaintiff must establish that the defendant acted with "deliberate indifference" to the harassment. *See Davis*, 526 U.S. at 643. Deliberate indifference is a stringent standard that requires more than mere negligence. *Id.* at 642-43 (declining to impose liability under a negligence standard); *see also Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020) (explaining that "[t]his is a fairly high standard—a 'negligent, lazy, or careless' response will not suffice" (quoting *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006))).

Addressing deliberate indifference in the context of student-on-student harassment, the Supreme Court has explained that Title IX liability will arise only from "an official decision by the recipient not to remedy the violation," citing the "high standard imposed" in *Gebser v. Lago Vista Independent School District*. *Davis*, 526 U.S. at 642-43 (first quote quoting *Gebser*, 524 U.S. at 291), 653 (also warning that "[p]eer harassment, in particular, is less likely to satisfy [Title IX] requirements than teacher-student harassment"); *see also Karasek*, 956 F.3d at 1104-05, 1108-09 (explaining damages are not recoverable for a Title IX violation unless the

---

[4]If the investigation found bullying, the school then had to make "recommendations concerning the imposition of disciplinary action or other measures . . . in accordance with the policy governing disciplinary action adopted by the board of trustees of the school district." NRS 388.1351(2).

Supreme Court
OF
Nevada

(O) 1947A

14

defendant made an official decision not to remedy the situation, and considering this point in the context of deliberate indifference). The Court has also admonished district courts to "refrain from second-guessing the disciplinary decisions made by school administrators," who "will continue to enjoy the flexibility they require" so long as the school "merely respond[s] to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 648-49. The Ninth Circuit later explained that, "[a]bsent an unreasonable response, [courts] cannot 'second-guess[ ] the disciplinary decisions made by school administrators. And the reasonableness of the response depends on the educational setting involved . . . ." *Karasek*, 956 F.3d at 1105 (citation omitted) (quoting *Davis*, 526 U.S. at 648-49).[5]

The Ninth Circuit has explained that Title IX also requires "the deliberate indifference [to], at a minimum, cause students to undergo harassment or make them liable or vulnerable to it," and that "'deliberate indifference' occurs 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Reese*, 208 F.3d at 739 (quoting *Davis*, 526 U.S. at 645, 648); *see also Karasek*, 956 F.3d at 1105 (addressing deliberate indifference and causation). Even ineffective responses may still satisfy the school's obligation where the response was not clearly unreasonable and therefore does not amount to deliberate indifference. *See, e.g., Sauls v. Pierce Cty. Sch. Dist.*, 399 F.3d 1279, 1285 (11th Cir. 2005). And, again, negligence is not enough—the response or inaction must constitute an official decision against remedying the situation. *See, e.g., Davis*, 526 U.S. at 642-43.

---

[5]*Davis* gave an example of actionable student-on-student sexual harassment where male students physically threatened female peers in order to prevent them from using a school resource, and the school district administrators, while "well aware" of the harassment, "deliberately ignore[d] requests for aid." *Davis*, 526 U.S. at 650-51.

The Ninth Circuit recently addressed whether a school's violation of its own regulations and policies is deliberate indifference *per se* for purposes of Title IX liability. *Karasek*, 956 F.3d at 1107-08; *see also Per Se, Black's Law Dictionary* (11th ed. 2019) (defining "per se" as "standing alone, without reference to additional facts"). The Ninth Circuit held it is not, as a school can fail to follow federal or self-imposed regulations without being deliberately indifferent under federal law. *Karasek*, 956 F.3d at 1107-08 ("A damages remedy for Title IX violations is judicially implied, not statutorily created. . . . The Supreme Court in *Davis*, not Congress, articulated the deliberate-indifference standard."). Thus, although a school's noncompliance with statutes, regulations, and policies can be a significant factor in analyzing deliberate indifference, "particularly when it reflects 'an official decision . . . not to remedy the [Title IX] violation,'" noncompliance is not dispositive evidence of deliberate indifference. *Id.* at 1108 (quoting *Gebser*, 524 U.S. at 290 (alterations in original)).

We agree with *Karasek* that the violation of a regulation or policy—or here, a state statute—is not *per se* deliberate indifference. The foregoing clarifies that deliberate indifference is an exacting standard established by federal caselaw and requires the plaintiff to show, for instance, that the defendant was more than negligent, the response was clearly unreasonable in light of the known circumstances, and the indifference caused the plaintiff to either undergo harassment or made the plaintiff more vulnerable to it. *See, e.g.*, *Davis*, 526 U.S. at 642-43, 648-49; *Karasek*, 956 F.3d at 1104-05, 1108-09; *Reese*, 208 F.3d at 739. Moreover, Title IX damages are appropriate only where the plaintiff shows an official decision not to remedy the violation. *See, e.g.*, *Davis*, 526 U.S. at 642-43; *Karasek*, 956 F.3d at 1108.

Accordingly, although the violation of a statute, regulation, or policy may inform a finding of deliberate indifference, the state law violation could not constitute *per se* deliberate indifference. Our careful review of the district court's orders shows it erroneously focused on the statutory violation in finding deliberate indifference without expressly analyzing the elements of deliberate indifference under the applicable federal standards. The relevant question under the pleaded claims was not whether Greenspun administrators failed to comply with NRS 388.1351, but whether the response was more than negligent, was clearly unreasonable in light of the known circumstances, and caused the boys to either undergo harassment or be more vulnerable to it. *See, e.g., Davis*, 526 U.S. at 642-43, 648-49; *Karasek*, 956 F.3d at 1104-05, 1108-09; *Reese*, 208 F.3d at 739. Again, while the facts underlying the statutory violation may inform a finding of deliberate indifference, the statutory violation and the deliberate indifference are separate legal questions.

And, after reviewing the record, we cannot say that substantial evidence supports the district court's finding of deliberate indifference regardless of this error. *See Saavedra-Sandoval v. Wal-Mart Stores, Inc.*, 126 Nev. 592, 599, 245 P.3d 1198, 1202 (2010) (recognizing that we can affirm a district court's decision on different grounds than those used by the district court). In regard to the September reports[6] of Nolan's harassment, despite whether Greenspun administrators failed to comply with NRS 388.1351 at that time, the record shows that CCSD's employees were at

---

[6]While the district court did not separately address the responses to the September and October reports of harassment, we choose to do so because the record does not support that CCSD employees knew of the sexual nature of the harassment before October, Mary failed to inform Principal McKay of the harassment in September by misspelling his email address, and Nolan did not report the sexual harassment and downplayed the harassment when school officials asked about it in September.

most negligent and their response was not unreasonable in light of the known circumstances. The dean followed the school's procedure and met with C. and his mother to remind C. about the school's hands-off policy for students and instructed him to stop bullying Nolan. She also spoke to the band teacher about rearranging the classroom seating. Although the band teacher and the school counselor were not school administrators, both took action as well. The band teacher spoke to C. and D. about their behavior and rearranged the seating to move Nolan away from C. and to where he could easily watch the boys. The school counselor met with Nolan, encouraged him to report the stabbing incident to the dean, and walked Nolan to the dean's office for that purpose. With the advantage of hindsight, it is clear the response failed to prevent further harassment. Nevertheless, the record does not demonstrate that CCSD deliberately failed to take action or that any of the actions taken amounted to more than mere negligence in light of the known circumstances. *See, e.g.*, *Karasek*, 956 F.3d at 1104. Accordingly, to the extent the district court found deliberate indifference based upon CCSD's action or inaction in September, that finding is not supported by the record. *See Karasek*, 956 F.3d at 1107-08.

The school's response following the October report, however, presents a closer call. Although all of CCSD's employees denied receiving notice of the sexual nature of the harassment until after the boys left the school, and Ethan and Nolan hid the harassment from the administrators, Mary testified she informed the dean of the full details of the harassment on October 19. Thus, the record supports that, by October, Greenspun administrators knew the harassment was sexual in nature, ongoing, unresolved by the school's earlier efforts, and now involved Ethan as well as Nolan. Moreover, no administrator could recall actually investigating that report or whether another employee had actually done so.

Supreme Court
OF
Nevada

(O) 1947A

18

Importantly, the information gained from the investigation of the September incident, and Greenspun's administrators' failure to prevent future harassment, informs the October incident. Indeed, at that point it was clear that further investigation and more serious intervention was necessary to stop the sexual and other harassment against Nolan and Ethan, as well as to prevent further bullying and physical assaults. But by finding that the school's violation of a state statute constituted *per se* deliberate indifference, the district court bypassed the key questions of whether the evidence demonstrated CCSD was more than negligent, that its inaction was clearly unreasonable in light of the known circumstances, and that its inaction caused the boys to either undergo harassment or be more vulnerable to it. *See Davis*, 526 U.S. at 642-43, 648-49; *Karasek*, 956 F.3d at 1104-05, 1108-09; *Reese*, 208 F.3d at 739. And because there was substantial conflicting testimony regarding what occurred during and following the harassment, we decline to resolve this issue on appeal, as in light of the evidence adduced at trial it is an issue more appropriately determined by the district court.[7] *See, e.g.*, *Davis*, 526 U.S. at 639-54 (addressing the elements of a Title IX claim and reversing the dismissal of a complaint after concluding the plaintiff presented facts that, if supported by evidence the fact-finder found credible, would support a violation); *Ellis*, 123 Nev. at 152, 161 P.3d at 244 (recognizing that it is the district court's duty to make credibility determinations regarding conflicting evidence).

We therefore reverse the decision insofar as it was based upon the September complaint but remand for additional findings as to whether

---

[7]While evidence supports the district court's conclusion that CCSD's inaction made the boys more vulnerable to harassment, the district court, by focusing on the statutory violation, failed to appropriately analyze this issue. We therefore do not address this particular point here, instead leaving this element for the district court to address on remand when determining whether Bryan established deliberate indifference.

SUPREME COURT
OF
NEVADA

(O) 1947A

the events following the October report constituted deliberate indifference under the applicable federal standards.

*Section 1983 liability*

On appeal, CCSD contends Bryan's § 1983 claim fails on multiple grounds, including, again, on the deliberate indifference prong. As set forth below, we agree Bryan's § 1983 claim fails, and we therefore reverse the district court's finding of liability under that statute.[8]

42 U.S.C. § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

To prove liability under § 1983, the plaintiff must show "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). Because the "state is not liable for its omissions," and § 1983 "does not impose a duty on [the state] to protect individuals from third parties," *id.* (alteration in original) (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000), and *Morgan v. Gonzales*, 495 F.3d 1084,

---

[8]Our above analysis regarding deliberate indifference under Title IX equally applies to the § 1983 claim. *See, e.g.*, *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1133, 1135 (9th Cir. 2003) (addressing the plaintiff's § 1983 claim alleging student-on-student harassment and quoting *Davis*, 526 U.S. at 649, for the proposition that the deliberate indifference required for such a claim exists where school administrators "respond[ ] to known peer harassment in a manner that is . . . clearly unreasonable"). In light of the foregoing and our decision regarding *Monell* liability, we need not separately address deliberate indifference here.

1093 (9th Cir. 2007)), a plaintiff cannot recover for student-on-student harassment unless the plaintiff shows the state affirmatively placed the plaintiff in danger.[9] *See id.* at 971-72 (addressing the state-created danger exception).

In addition, a school *district* will not be liable for student-on-student harassment unless the school district's official policies caused the deprivation of the protected rights (*Monell* liability). *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978) (addressing how a governmental entity may be held liable for injuries caused by its employees and agents); *Lansberry v. Altoona Area Sch. Dist.*, 318 F. Supp. 3d 739, 758 (W.D. Pa. 2018) (explaining that for a school district to have liability under *Monell*, it "must establish that the [district] had a 'policy or custom' and that the policy or custom 'caused' the constitutional violations" (quoting *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003))); *see also L.A. Cty. v. Humphries*, 562 U.S. 29, 35 (2010) (concluding a municipality and other governing bodies (such as school districts) typically cannot be held vicariously liable under § 1983).

More specifically, and as applicable here, *Monell* liability will attach if the "district employee was acting as a 'final policymaker.'" *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004) (quoting *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003)) (addressing the three circumstances under which *Monell* liability applies to a school district). To be a final policymaker for purposes of *Monell* liability, the district employee "must be in a position of authority such that a final decision by that person may appropriately be attributed to the District." *Id.* at 983. A plaintiff satisfies this element by showing that a decisionmaker with final authority to establish policy with

---

[9]There is a second exception, the "special relationship" exception, which is not at issue here.

SUPREME COURT
OF
NEVADA

(O) 1947A

21

respect to the issue takes action that effectively binds the school district. *See Lansberry*, 318 F. Supp. 3d at 758. Authority to make school district policy can be granted by the legislature or delegated by an official who possesses the policymaking authority. *Lytle*, 382 F.3d at 983.

In considering *Monell* liability, courts must look to the particular situation to determine whether the district employee is a policymaker, asking "whether he or she has authority '*in a particular area, or on a particular issue.*'" *Id.* (emphasis in *Lytle*) (quoting *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 (1997)). Courts must therefore consider "whether there is an actual opportunity for meaningful review" of the subject decision. *Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004) (internal quotation marks omitted). "If a higher official has the power to overrule a decision but as a practical matter never does so, the decision-maker may represent the effective final authority on the question." *Bowen v. Watkins*, 669 F.2d 979, 989 (5th Cir. 1982). We review de novo the district court's decision regarding final policymaker authority. *See Holloman*, 370 F.3d at 1292.

Here the district court concluded that the elements of *Monell* liability were satisfied because under NRS 388.1351(2)'s directive, the principal or his designee investigate bullying reports and Principal McKay was a decisionmaker with final authority to make policy (a final policymaker) with respect to student discipline. For the reasons below, we conclude the § 1983 claim fails on this element.[10]

---

[10]Given our disposition under *Monell*, we need not address the other elements of § 1983 liability, but after carefully reviewing the record and the law, we find Bryan's arguments with respect to the federal constitutional right and the state-created danger exception to be without merit.

SUPREME COURT
OF
NEVADA

(O) 1947A

Although the above caselaw makes clear that, in some circumstances, a principal may be a final policymaker for purposes of *Monell* liability, in this matter, the appellate record does not support that Principal McKay was a final policymaker. While NRS 388.1351 clearly tasked principals and their designees with investigating bullying allegations and recommending discipline for violations, those recommendations are to be in accordance with the district's disciplinary policies. *See* NRS 388.1351(2). More importantly, the record established that Principal McKay did not have the final say over student discipline, as his superiors could overrule his decisions. Even in this case, Principal McKay did not have the final say over C.'s and D.'s discipline, as the school district ordered him to suspend both students—overriding Principal McKay's concerns regarding D.'s suspension. Accordingly, the district court erred by concluding Bryan established this element.

Based on the foregoing, we reverse the district court's decision as to the § 1983 claim.

### CONCLUSION

Following *Bostock v. Clayton County*, we hold Title IX's protections against sex-based discrimination extend to prohibit discrimination against homosexual and transgender individuals, as well as discrimination based on perceived sexual orientation. ___ U.S. ___, 140 S. Ct. 1731 (2020). Here, we conclude the record supports the district court's finding that the harassment was "on the basis of sex" for purposes of Title IX. While we conclude the record does not support the finding of deliberate indifference with respect to the September incident, we remand for additional findings as to whether the events following the October report demonstrate deliberate indifference. And finally, we reverse the decision as

to the 42 U.S.C. § 1983 claim. In light of our decision, we necessarily reverse the damages and attorney fees awards.[11]

_____, J.
Silver

We concur:

_____, J.
Hardesty

_____, J.
Stiglich

_____

[11]We do not reach the substantive arguments regarding the damages and attorney fees awards here. We note, however, several concerns with the damages award. First, Mary and Aimee merely speculated to their out-of-pocket expenses, and the record does not support the district court's calculation for five years of out-of-pocket expenses for each boy. We are also troubled by the district court's reliance on a settlement agreement in an unrelated federal case to calculate physical and emotional distress damages. We caution that damages cannot be merely speculative or simply based on another case's settlement agreement. *See Frantz v. Johnson*, 116 Nev. 455, 469, 999 P.2d 351, 360 (2000) (explaining there must be an evidentiary basis for an award). We also caution courts in civil rights cases to consider whether the plaintiffs have a duty to mitigate damages. *See* 2 Civ. Actions Against State & Local Gov't § 13:15 (2d ed. 2002) (addressing the plaintiff's responsibility to mitigate damages when suing under civil rights statutes due to the application of common-law tort principles to determine the remedies for such claims).

To the extent CCSD argues state law caps on damages awards apply, we note that where liability arises from the violation of a federal law, state law damages caps will likely not apply. *See, e.g., Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 956-57 (7th Cir. 2018) (noting the variations on damages caps among the states, declining to apply state law caps to punitive damages under § 1983, and considering whether federal caps should apply); *Commonwealth Div. of Risk Mgmt. v. Va. Ass'n of Cty.'s Grp. Self Ins. Risk Pool*, 787 S.E.2d 151, 160 (Va. 2016) (concluding that state statutory caps on damages in medical malpractice cases applied only to state claims, not to federal civil rights claims, based on the language of the relevant state statutes).